## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| INDYMAC BANK, F.S.B.,<br>a Federal Savings Bank, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  07 C 6226 |
| | ) | |
| GANESAN VISVABHARATHY, an<br>individual | ) | Judge Joan B. Gottschall |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO
## VACATE ORDER OF DEFAULT AND QUASH SERVICE

In support of his Motion to Vacate Order of Default and Quash Service, defendant, Ganesan Visvabharathy, states as follows:

### Introduction

Defendant, Ganesan Visvabharathy, brings this motion because the order of default obtained in this matter by plaintiff, Indymac, LLC ("Indymac"), should not have issued, because Indymac never effectively served Dr. Visvabharathy.  Indymac obtained the January 17, 2008 order of default (attached as Exhibit A) based on its contention that it effected substituted service on Dr. Visvabharathy at his abode.  However, the purported service was not attempted at Dr. Visvabharathy's abode but, rather, at the home of his estranged wife, Dr. Suriya Sastri.  Drs. Visvabharathy and Sastri are separated, and Dr. Visvabharathy has not lived in the former marital home for at least a year and a half.  Worse, Indymac's process server was told this by Dr. Sastri when he attempted service, yet he not only persisted in attempting substituted service there (after threatening Dr Sastri and her children with harassment), but submitted an affidavit asserting falsely that service was made at Dr. Visvabharathy's "usual place of abode."

**Procedural Background**

Indymac filed its complaint in this action on November 2, 2007. On January 2, 2008, it filed a Motion for Default (attached as Exhibit B), based on its contention that it had effected substituted service on defendant Dr. Visvabharathy at his abode on December 1, 2007. (Motion for Default ¶ 3). The Court entered an order of default on January 17, 2008, and set the matter for a prove-up hearing. Counsel for Dr. Visvabharathy filed their appearance on January 25, 2008, and attended the scheduled prove-up hearing, at which time the Court set the schedule for briefing on the present motion.

**Related Actions**

This is one of three actions between essentially the same parties, and which raise identical issues of service. Indymac and its corporate affiliate, IBA, LLC, have brought two additional actions based on guarantees of loans made in connection with projects that are the same as, or related to, the one underlying this matter: *Indymac Bank, F.S.B. v. Visvabharathy, et al.*, No. 07 C 6224 (Guzman, J.) and *IBA, LLC v. Visvabharathy*, No. 07 C 6219 (Andersen, J.). Indymac and IBA rely on the same alleged act of service in all three actions to support their contentions that default is appropriate – *i.e.*, they say that their process server served all three actions together.

Unlike the present action, and also unlike No. 07 C 6219 (Judge Andersen), Dr. Visvabharathy learned of the default proceedings in No. 07 C 6224 (Judge Guzman) prior to entry of an order of default. Contemporaneously with this motion, Dr. Visvabharathy is filing a response to Indymac's Motion for Default in that action. Judge Guzman has scheduled a status hearing for February 22, 2008, at which time he will decide whether an evidentiary hearing is necessary on the issue of service. (January 15, 2008 Order in No. 07 C 6224, attached as Exhibit

C).

An order of default was entered in No. 07 C 6219 (Judge Andersen) before Dr. Visvabharathy learned of the default proceedings, and before his counsel appeared. Judge Andersen elected to proceed with Indymac's requested default judgment, which he entered on February 5, 2008. Contemporaneously with the filing of this motion, Dr. Visvabharathy is filing his Rule 60(b)(4) Motion to Set Aside Default Judgment and Quash Service in that action.

**Argument**

Rule 4(e) sets forth the requirements for service of federal process on an individual in the United States. Pursuant to Rule 4(e)(2), service on an individual is accomplished by (A) delivering process to him personally; (B) leaving process at the individual's "dwelling or usual place of abode" with another individual who resides there; or (C) delivering process to an agent authorized to receive it on behalf of the individual. Fed. R. Civ. P. 4(e)(2).[1] Indymac has asserted that it accomplished service on Dr. Visvabharathy, per Rule 4(e)(2)(B), by leaving a copy of process with his wife at Dr. Visvabharathy's "usual place of abode" at 7529 Ridgewood Lane, Burr Ridge, Illinois. (Motion for Default ¶ 3 & Ex. C thereto). Indymac is wrong, because this is not Dr. Visvabharathy's abode, and has not been for at least a year and a half.

Dr. Visvabharathy has not lived at 7529 Ridgewood Lane since at least the summer of 2006. (Affidavit of Suriya Sastri, attached as Exhibit D, ¶ 2; Affidavit of Ganesan Visvabharathy, attached as Exhibit E, ¶ 2). Prior to the summer of 2006, he did reside at that house with his wife, Dr. Suriya Sastri, but permanently moved out as part of their legal separation. (Sastri Aff. ¶ 2; Visvabharathy Aff. ¶ 2). Their divorce proceedings are pending.

---

[1] The Federal Rules also authorize service on individuals in accordance with state law governing service of process. Fed. R. Civ. P. 4(e)(1). However, Illinois state law regarding service on individuals is essentially identical to the Federal Rule. *See* 735 ILCS 5/2-203.

(Sastri Aff. ¶ 2; Visvabharathy Aff. ¶ 2). When he moved out, Dr. Visvabharathy established his own, separate abode. (Sastri Aff. ¶ 3; Visvabharathy Aff. ¶ 3). Moreover, Dr. Visvabharathy has been traveling abroad in recent months, including during the time of Indymac's alleged service. (Visvabharathy Aff. ¶ 4). Dr. Visvabharathy has not, in fact, received the process in this matter from his wife. (Sastri Aff. ¶ 6; Visvabharathy Aff. ¶ 5).

The law is clear that leaving process with an estranged spouse at the former marital residence is not sufficient to accomplish substitute service. *Williams v. Capital Transit Co.*, 215 F.2d 487, 489-90 (C.A.D.C. 1954) ("Of course, if the defendant did not in fact reside at [the former marital residence], it was not his 'usual place of abode' even if his wife, from whom he was separated, still resided there."); *Government Employees Ins. Co. v. Jackson*, No. CIV.A. 89-4010, 1995 WL 672830, at *2 (E.D. Pa. Nov. 6, 1995) (holding ineffective plaintiff's service on spouse, from whom defendant was separated) (a copy of this unpublished decision is attached as Exhibit F); *see also Leigh v. Lynton*, 9 F.R.D. 28 (E.D.N.Y. 1949) (holding service on wife in New York insufficient when defendant husband had returned to live in England). The same result obtains under Illinois law. *Chiaro v. Lemberis*, 171 N.E.2d 81, 85 (Ill. App. Ct. 1960) (noting that "[i]t is elementary law that where substituted service is attempted to be made under the statutory provisions, those provisions must be observed to the very letter," and holding that substituted service was not effective when made on defendant's wife, from whom he was separated, because they no longer shared an abode).

Not only was Indymac's attempted service ineffective in light of the above facts, but its own submission failed to substantiate even a *prima facie* case that it made proper substituted service. The only assertion that the place of attempted substituted service was proper is the offhand and formulaic recitation in the affidavit of Indymac's process server that he served a

member of the household "at the defendants [*sic*] usual place of abode." (Ex. C to Motion for Default). However, as Illinois courts have noted, such an assertion is outside the personal knowledge of a process server, and so cannot even be treated as evidence. *Chiaro*, 171 N.E.2d at 85. Accordingly, affidavits challenging this assertion of abode are to be taken as true (subject to counteraffidavits supporting the initial assertion). *Id.* (reversing failure to vacate default due to improper substituted service) *see also Williams*, 215 F.2d at 490 (plaintiff was required to present counter-evidence of abode in light of affidavits proffered by defendant showing that he was separated from his wife and did not reside where he was purportedly served); *Government Employees Ins. Co.*, 1995 WL 672830, at *2 (absent evidence that defendant lived at address where process was sent, service was ineffective). Here, Indymac provided no substantiation for its process server's assertion that 7529 Ridgewood Lane is Dr. Visvabharathy's "usual place of abode," while the only proper evidence of record demonstrates that his assertion is false.

The situation here is actually worse than that in *Chiaro*, *Williams*, and *Government Employees Ins.Co.*, where the assertion of abode was presumably made in good faith. When Indymac's process server first came to Dr. Sastri's home, she told him that Dr. Visvabharathy no longer lived there. (Sastri Aff. ¶ 4). Rather than do the requisite investigation and pursue proper service, Indymac's process server first threatened Dr. Sastri with harassment – saying that he would cause service to be made late at night and that he would seek information about Dr. Visvabharathy from their children – and then lied to her – saying that this Court had specifically ordered that service be made at her home. (*Id.* ¶ 4). On a subsequent visit, he left process at her door, even after she told him again that Dr. Visvabharathy no longer lived there. (*Id.* ¶ 5).

The process server's sworn assertion that 7529 Ridgewood Lane is Dr. Visvabharathy's "usual place of abode," despite having been informed to the contrary, was therefore not only

false, but also made in bad faith. Indymac's failure to disclose any of this to the Court (aside, arguably, from the one-word notation in its process server's affidavit: "uncooperative") only compounds its inappropriate conduct.

In all events, the affidavits submitted by Drs. Visvabharathy and Sastri establish that Indymac never effectively served Dr. Visvabharathy, and therefore the order of default judgment should be vacated, and service quashed.

## Conclusion

WHEREFORE, defendant Ganesan Visvabharathy respectfully requests that this Court enter an Order vacating its January 17, 2008 order of default, quashing service, and awarding such other and further relief as the Court deems proper.

Dated: February 14, 2008                    Respectfully submitted,

                                            GANESAN VISVABHARATHY


                                            By:_s/ Daniel A. Shmikler _____
                                                  One of his attorneys

Bruce S. Sperling
Daniel A. Shmikler
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois  60603
(312) 641-3200
(312) 641-6492 (fax)

# EXHIBIT A

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 07 C 6226 | **DATE** | 1/17/2008 |
| **CASE TITLE** | | Indymac Bank vs. Visvabharathy | |

**DOCKET ENTRY TEXT**

Motion hearing held. Plaintiff's motion for default [9] is granted. It is hereby ordered that default is entered against Defendant, Ganesan Visvabharathy for failure to appear or file an answer or responsive pleading. Prove-up hearing is set for 1/23/08 at 9:30AM.

Docketing to mail notices.

00:08

| | Courtroom Deputy Initials: | RJ |
|---|---|---|

07C6226 Indymac Bank vs. Visvabharathy

Page 1 of 1

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| INDYMAC BANK, F.S.B<br>a Federal Savings Bank, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | 07 C 6226 |
| | ) | |
| vs. | ) | Honorable Judge Joan B. Gottschall |
| | ) | |
| GANESAN VISVABHARATHY, | ) | |
| an individual | ) | |
| | ) | |
| Defendant | ) | |

## <u>MOTION FOR DEFAULT</u>

Plaintiff, INDYMAC BANK, F.S.B. ("Plaintiff"), by and through its attorneys, Levenfeld

Pearlstein, LLC, hereby files this Motion for Default against Defendant, GANESAN

VISVABHRATHY ("Defendant"), for his failure to appear or file an answer or responsive

pleading.  In support thereof, Plaintiff states as follows:

1.    On November 2, 2007, Plaintiff filed its Complaint for breach of guaranty (the

"Complaint").   A copy of the <u>Complaint</u> is attached hereto as Exhibit "A".

2.    On December 1, 2007,  Defendant was served by substitute service Summons and

Complaint.  A copy of the <u>Summons</u> is attached hereto as Exhibit "B".

3.    Defendant's Answer to Plaintiffs' Complaint was due on December 21, 2007.

4.    As of January 2, 2008, Defendant has failed to file an appearance or answer.  A

copy of the <u>Plaintiff's Attorney's Affidavit of Defaulted Parties</u> is attached hereto as Exhibit

"C".

WHEREFORE, Plaintiff, INDYMAC BANK, F.S.B., respectfully requests this Court enter an Order;

A)   Defaulting Defendant for his failure to appear or file Answer or responsive pleading;

B)   Setting a hearing date for prove-up of damages;

C)   Granting such further relief as this Court deems just and appropriate.

Respectfully submitted,

**INDYMAC BANK, F.S.B.**

By:  /s/ James G. Martignon
One of Its Attorneys

Gary I. Blackman (ARDC #6187914)
James G. Martignon (ARDC #6277974)
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle St., Suite 1300
Chicago, Illinois 60602
(312) 346-8380 - Telephone
(312) 346-8434 – Facsimile
gblackman@lplegal.com
jmartignon@lplegal.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and I hereby certify that I have mailed by United States Postal Service the document to the following:

Ganesan Visvabharathy
7529 Ridgewood Lane
Burr Ridge, IL 60527

/s/ James G. Martignon
James G. Martignon (ARDC #6277974)
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle St., Suite 1300
Chicago, Illinois 60602
(312) 346-8380 – Telephone
(312) 346-8434 – Facsimile
jmartignon@lplegal.com

3

# EXHIBIT A

RECEIVED

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NOV 02 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

INDYMAC BANK, F.S.B.,
a Federal Savings Bank,

    Plaintiff,

v.

GANESAN VISVABHARATHY,
an individual,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

MAGISTRATE JUDGE...

07C 6226

JUDGE GOTTSCHALL

## COMPLAINT

NOW COMES Plaintiff, Indymac Bank, F.S.B., a Federal Savings Bank ("Indymac"), by and through its attorneys Gary I. Blackman and James G. Martignon with Levenfeld Pearlstein, LLC, and for its Complaint against Ganesan Visvabharathy, an individual ("Visvabharathy"), respectfully states as follows:

### Parties

1.    Indymac is a federally chartered savings bank organized under the Home Owners' Loan Act, with its home office located in Pasadena, State of California.

2.    Visvabharathy, an individual, is a citizen of the State of Illinois, and a resident of Burr Ridge, Illinois.

### Jurisdiction and Venue

3.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between Plaintiff, a citizen of the State of California, and Defendant Visvabharathy, a citizen of the State of Illinois. The amount in controversy is in excess of $75,000, exclusive of fees and costs.

4.      Venue is proper in this court pursuant to 28 U.S.C. § 1391(a)(1) and (2) in that this Complaint is being brought in the judicial district where Defendant resides and a substantial part of the events and omissions giving rise to this claim occurred in this district.

### Facts Common to All Counts

5.      On or about July 28, 2005, Indymac extended a loan to Bluff House, LLC, an Illinois limited liability company ("Bluff House"), and Anastasia Shores, LLC, an Illinois limited liability company ("Anastasia"), in the principal amount of $46,850,000.00, secured by a Promissory Note (the "Note"), which Indymac, Bluff House and Anastasia executed pursuant to their Building Loan Agreement (the "Agreement"), for the purpose of funding the development of real property. A copy of the Note is attached hereto as Exhibit 1 and incorporated herein by reference. A copy of the Agreement is attached hereto as Exhibit 2 and incorporated herein by reference.

6.      At all relevant times, Visvabharathy was the Manager of Bluff House.

7.      At all relevant times, Visvabharathy was the Manager of Anastasia.

8.      In order to induce Indymac to make the loan to Bluff House and Anastasia, Visvabharathy executed a General Guaranty (the "Guaranty"), wherein Visvabharathy agreed to repay all monies owed to Indymac under the Note. A copy of the Guaranty is attached hereto as Exhibit 3, and incorporated herein by reference.

9.      Visvabharathy agreed, *inter alia*, that the Guaranty would be absolute, unconditional, independent, and a guaranty of payment and not collection of the Note.

10.      The Note matured on April 28, 2007 and was not repaid.

2

11. On July 23, 2007, Indymac made demand for payment of the Note, and declared the entire principal balance of the Note, together with unpaid interest, costs, late fees and other charges, to be immediately due and owing. A copy of Indymac's demand is attached hereto as Exhibit 4, and incorporated herein by reference.

12. As of October 25, 2007, there is due and owing under the Note principal, interest and expenses in the amount of $34,785,755.55, including attorneys fees, costs, late fees and other charges. Interest continues to accrue under the Note.

### COUNT I
### Breach of Guaranty
### Ganesan Visvabharathy

13. Plaintiff restates and reincorporates by reference Paragraphs 1 through 12 of this Complaint as Paragraph 13 herein.

14. The Guaranty constitutes a valid, binding and existing contract between Indymac and Visvabharathy.

15. Visvabharathy has breached the Guaranty by failing to pay all amounts owed Indymac.

16. As a proximate result of Visvabharathy's breach of the Guaranty, Indymac has been monetarily damaged.

17. Indymac has fully complied with any and all obligations it had to Visvabharathy pursuant to the Guaranty.

18. As of October 25, 2007, there exits a balance owed to Indymac under the Note in the amount of $34,785,755.55, with per diem interest thereafter, plus interest, attorneys' fees and costs.

3

WHEREFORE, Plaintiff, Indymac Bank, F.S.B., respectfully requests that this Court enter judgment in its favor, and against Ganesan Visvabharathy in the amount of $34,785,755.55, with per diem interest thereafter, plus interest, attorneys' fees and costs, as provided under the Guaranty.

Dated: November 2, 2007

INDYMAC BANK, F.S.B.

By: _____
One of Its Attorneys

Gary I. Blackman (ARDC # 6187914)
James G. Martignon (ARDC #6277974)
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle St., Ste 1300
Chicago, Illinois 60602
Telephone: (312) 346-8380
Facsimile: (312) 346-8434

PLAINTIFF'S

EXHIBIT

07-28-2005

Loan No. 52-8300000

## PROMISSORY NOTE

$46,850,000.00                                       Jacksonville, Florida

July 28, 2005

THIS NOTE PROVIDES FOR INTEREST AT A FLUCTUATING RATE PER ANNUM
BASED ON THE PRIME RATE (PLUS ANY APPLICABLE SPREAD OVER THE PRIME RATE
INDICATED BELOW) ON THE TERMS AND CONDITIONS SET FORTH BELOW.

This Note is executed pursuant to the Building Loan Agreement dated as of the date of
this Note among BLUFF HOUSE, LLC, an Illinois limited liability company, and ANASTASIA
SHORES, LLC, an Illinois limited liability company (individually and collectively, the "Borrower")
and INDYMAC BANK, F.S.B., (the "Lender") (such Building Loan Agreement, as it may from
time to time be supplemented, modified and amended, being referred to in this Note as the
"Agreement"), the terms and conditions of which are hereby incorporated by reference.
Capitalized terms not otherwise defined in this Note shall have the meaning ascribed thereto in
the Agreement.

1.    FOR VALUE RECEIVED, the Borrower promises to pay to the Lender, or order,
at the Lender's office located at 3465 East Foothill Boulevard, 1st Floor, Pasadena, California
91107, Attention:  Homebuilder Division (or such other location specified by the Lender from
time to time in writing), the principal amount of FORTY-SIX MILLION EIGHT HUNDRED FIFTY
THOUSAND and 00/100 Dollars ($46,850,000.00), or so much of such amount as may be
advanced by or on behalf of the Lender from time to time, together with interest as provided in
§ 3 below.

2.    If not sooner paid, the principal of this Note shall be payable on April 28, 2007
(the "Maturity Date").  Accrued interest shall be payable on the first day of each calendar month,
on the Maturity Date and on the date of final payment of the principal of this Note in full, except
that any interest which accrues after the Maturity Date or the acceleration of the maturity of this
Note shall be payable immediately and without demand.

3.    (a)    The unpaid principal of this Note outstanding from time to time shall bear
interest at a fluctuating rate per annum (computed on the basis of a year of 360 days and actual
days elapsed) equal at all times to the Prime Rate plus twenty-five one-hundredths percent
(0.25%) per annum, with each change in such rate taking effect simultaneously with the
corresponding change in the Prime Rate (such fluctuating rate of interest being referred to in
this Note as the "Base Rate").  Notwithstanding the preceding, in no event shall the Base Rate
be less than Six and one-half (6.50%) per annum.

(b)    Accrued interest not paid when due shall, from and after the date when
due until the date such interest is paid, bear interest at the Alternate Rate.  The

Alternate Rate shall also apply to any judgment obtained with respect to this Note and/or the Loan Documents until the amount of such judgment is paid in full.

      (c)    In the event that accrued interest is not paid to Lender on or before the twentieth (20th) calendar day of each month in which it becomes due, Borrower shall pay, upon demand by the Lender, a late or collection charge equal to five percent (5.00%) of the amount of such unpaid interest payment. Borrower agrees that this late or collection charge represents a reasonable sum considering all of the circumstances existing on the date of execution of this Note and represents a fair and reasonable estimate of the costs that Lender will incur by reason of late payment. Borrower further agrees that proof of actual damages would be costly and inconvenient. Acceptance by Lender of payment of the late or collection charge payable pursuant to this Section 3(c) will not constitute a waiver of the Event of Default which occurred by reason of the failure of Borrower to make timely payment and will not prevent Lender from exercising any other rights or remedies available to Lender by reason of such Event of Default.

      (d)    Notwithstanding § 3(a), any principal of this Note not paid when due (whether at the stated maturity, by acceleration or otherwise) shall, from and after the date when due until the date such principal is paid, bear interest at the Alternate Rate.

      (e)    As used in this Note:

      "Alternate Rate" means a fluctuating rate per annum (computed on the basis of a year of 360 days) equal at all times to the Base Rate plus 10.00% per annum, with each change in such rate taking effect simultaneously with the corresponding change in the Base Rate.

      "Prime Rate" means the rate as published in the "Money Rates" section of The Wall Street Journal with changes thereon to be effective as of the date of such change. The foregoing notwithstanding, if The Wall Street Journal ceases to publish the "Money Rates" section or if there is a suspension of publication of The Wall Street Journal, then an alternative source for determining the Prime Rate shall be selected by Lender in its sole discretion."

      4.    This Note may be prepaid in whole or in part at any time without penalty. All payments on this Note shall be made in lawful money of the United States in same day funds.

      5.    This Note is the "Note" referred to in, and is entitled to the rights and benefits of, the Agreement, and evidences advances of the proceeds of the loan made by or on behalf of the Lender to the Borrower under the Agreement. Among other things, the Agreement provides for acceleration of the maturity of this Note upon the happening of certain stated events and may also contain additional provisions regarding voluntary and mandatory prepayments under certain conditions. This Note is secured by the Mortgage and Security Agreement executed by the Borrower in favor of the Lender pursuant to the Agreement and by any other collateral agreements referred to in the Agreement which purport to secure this Note.

*IMB00011*

6.     This Note shall be governed by, and construed and enforced in accordance with, the laws of Florida.

7.     Neither this Note nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of this Note. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all indebtedness that constitutes interest, as well as all other charges made in connection with the indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

8.     Time is of the essence of each and every provision of this Note.

"BORROWER":

BLUFF HOUSE, LLC, an
Illinois limited liability company

By: _Srismon_____
Ganesan Visvabharathy, Manager

ANASTASIA SHORES, LLC, an
Illinois limited liability company

By: _Srismonwos_____
Ganesan Visvabharathy, Manager

**Florida Documentary Stamp Tax in the amount of $ computed on the face amount of this Note has been paid and the Mortgage and Security Agreement securing this Note recorded in Clay and St. John Counties, Florida has been so noted.**

PLAINTIFF'S
EXHIBIT
2

07-28-2005

Loan No. 52-8300000

BUILDING LOAN AGREEMENT

(Condominium Conversion)

Dated as of July 28, 2005

BLUFF HOUSE, LLC, an Illinois limited liability company and ANASTASIA SHORES, LLC, an Illinois limited liability company (individually and collectively, the "Borrower"), and INDYMAC BANK, F.S.B. (the "Lender"), agree as follows:

1.00   Preliminary Statement.   The Borrower owns or is about to acquire the Land described in Exhibit "A", which consists of (A) 41 multi-unit Buildings located in St. Augustine Beach, St. John County, Florida (the "Anastasia Property"), and (B) 30 multi-unit Buildings located in Orange Park, Clay County, Florida (the "Bluff Property"), and intends to construct 164 residential condominium Units and other Improvements on the Anastasia Property and 292 residential condominium Units and other Improvements on the Bluff Property in accordance with the Improvement Plans submitted by the Borrower to the Lender. In order to finance the Land and the construction of the Improvements and the payment of various costs and expenses relating to the Project, the Borrower has applied to the Lender for a Loan in the amount of $46,650,000.00, the repayment of which will be secured by the Borrower's interest in the Land and the Improvements and the other Collateral covered by the Mortgage to be executed by the Borrower in favor of the Lender. The Lender is willing to make the Loan to the Borrower on the terms and conditions set forth in this Agreement.

Capitalized terms used in this Agreement and not otherwise defined are used with the meanings set forth in Exhibit "F".

2.00   Documentation.   Prior to the earlier of the first Disbursement of the proceeds of the Loan or the issuance of the first Set Aside Letter or Letter of Credit, if any, requested by the Borrower, the Borrower shall deliver or cause to be delivered to the Lender, in form and substance satisfactory to the Lender, the Loan Documents and other "Required Items" specified in Exhibit "C" and shall satisfy the conditions specified in Exhibit "C", together with such other Documents and Information relating to any Loan Party, the Collateral, the Project or the transactions contemplated by the Loan Documents as the Lender may reasonably request.

3.00   Disbursements, Set Aside Letters and Letters of Credit.   Subject to the terms, conditions and procedures set forth in this Agreement and in the "Disbursement Schedule" attached as Exhibit "B", the Lender shall make Disbursements to or for the account of the Borrower and issue or cause to be issued Set Aside Letters and Letters of Credit from time to time from the date of this Agreement to the Banking Day immediately preceding the Maturity Date. The aggregate amount of all Disbursements made by or on behalf of the Lender (including amounts funded under any Set Aside Letter or Letter of Credit) shall not exceed the Loan Amount plus the amount of any "Borrower's Funds" deposited with the Lender pursuant to the Disbursement Schedule (provided, however, that the foregoing limitation shall not affect the liability of the Borrower for payment of any Disbursements in excess of such amounts and interest thereon, whether occurring

1

LP 784333.6 \ 31849-50518

*IMB00248*

by reason of a payment under a Letter of Credit or Set Aside Letter or otherwise). All Disbursements of the proceeds of the Loan shall be evidenced by and repayable in accordance with the terms of the Note.

4.00    Covenants of the Borrower.  Unless the Lender otherwise consents in writing:

4.01    Construction of Improvements.  The Borrower shall cause construction of the Improvements to commence within seven (7) months after the date the Mortgage is recorded, and shall be diligently and continuously prosecuted to completion, subject in each case to the following requirements:  (a) the Improvements shall be constructed in substantial conformity with the Improvement Plans and in compliance in all material respects with all applicable Laws and Other Requirements, and in a good and workmanlike manner with new materials of good quality;  (b) except as otherwise contemplated by the Improvement Plans with respect to any "Site Development" referred to in the Project Budget, the Improvements shall be constructed entirely on the Land and shall not encroach upon or overhang any lot line, boundary, set-back, easement, right-of-way or other land; (c) the "plan number" for each Unit shall be constructed on the lot or at the location specified in Exhibit "E"; and (d) construction of the Improvements shall in any event be completed on or before the Maturity Date; and (e) the Borrower hereby covenants and agrees, on behalf of itself and any of its Affiliates, that no such Person shall construct, create, arrange, develop, purchase or sell any residential housing improvement (or units which are components thereof) which constitute a Competing Project.

If at any time the Lender notifies the Borrower that construction of the Improvements does not conform to the requirements of this § 4.01 or any such nonconformity is otherwise discovered by the Borrower, the Borrower shall immediately cause such nonconforming construction to be stopped and all necessary corrective work to be commenced and diligently and continuously prosecuted to completion.

4.02    Change Orders.  The Borrower shall not permit any Change Order to the Improvement Plans to be implemented without the prior approval of the Lender; provided that this § 4.02 shall not prevent routine changes in construction which would not cause the Improvements to fail to be in substantial conformity with the approved Improvement Plans and which are not otherwise material in the aggregate.

4.03    Compliance with Laws and Other Requirements.  The Borrower shall (a) designate the Lender as "construction lender" in all applications for building permits, the Notice of Commencement under Section 713.13, Florida Statutes and in the Construction Contract, if any, and provide the Lender's name and address to all Lien Claimants who have given preliminary 20-day notice, in each case as required by Section 713.06(2), Florida Statutes, unless served upon Lender, (b) comply in all material respects with all other applicable Laws and Other Requirements relating to the Collateral or the Project, and (c) obtain and maintain all Authorizations required in connection with the Collateral or the Project.

4.04    Project Agreements.  The Borrower shall (a) take all action reasonably necessary or appropriate to maintain and enforce its rights and interests under each of the Project Agreements (including the Architect Agreement, the Construction Contract, if any, and any Financing Commitment), (b) comply in all material respects with its

2

IMB00249

obligations under each of the Project Agreements, (c) not permit or agree to any supplement, modification, amendment or termination of, or consent or agree to any waiver of or departure from the terms of, any of the Project Agreements, and (d) not transfer, encumber or release any interest in, or commit or permit any material breach or default on the part of the Borrower under, any of the Project Agreements, except that so long as no Event of Default has occurred, this §4.04 shall not apply (i) to any amendment of the Architect Agreement or the Construction Contract, if any, to incorporate any Change Orders which are permitted to be implemented by §4.02, or (ii) to the termination of any Project Agreement as a result of a material breach or default by a party other than the Borrower, provided such Project Agreement is replaced with a contract between the Borrower and a contractor reasonably approved by the Lender, in form and content reasonably approved by the Lender, which contract provides for performance of the work of the terminated Project Agreement within the time and budget approved by the Lender, and the Borrower delivers to the Lender an assignment of such contract and a consent by the contractor to such assignment, in each case in form and content reasonably approved by the Lender.

4.05    Lien Priority and Restrictions on Sale or Encumbrance; Partial Releases. Borrower will not enter any Architect Agreement, Construction Contract or other contract or agreement, express or implied, with any Person that could serve as a basis for any Lien Claim until after the date the Mortgage is recorded or shall obtain a subordination of any such contract or agreement to the Mortgage. The Borrower shall take all action necessary or appropriate from time to time to maintain the Mortgage as an indefeasible first priority perfected Lien in the Collateral, and shall not at any time part with possession of or abandon any of the Collateral or cause or permit any interest in any of the Collateral to be sold, transferred, leased, encumbered, released, relinquished or otherwise disposed of (whether voluntarily, by operation of law or otherwise), provided that: (a) so long as no Event of Default has occurred and is continuing, and subject to satisfaction of all "Presale Requirements" set forth in Exhibit "C" and receipt by the Lender of the applicable "Release Price" set forth in Exhibit "E" and payment of all applicable costs, fees and expenses, (i) the Borrower may sell Units (together with undivided interests in common areas to be transferred to purchasers of such Units) in the ordinary course of business for an amount not less than the "Minimum Sales Price" set forth in Exhibit "E" and transfer common areas to a homeowners association if and when required by applicable Laws or Other Requirements, (ii) the Lender shall release Units and common areas or interests in common areas so sold or transferred from the Lien of the Mortgage, and (iii) the Borrower may, in the ordinary course of business, receive, hold and dispose of any excess proceeds resulting from the sale of any Unit after payment of the applicable "Release Price"; and (b) the requirements of this sentence shall not prohibit (1) the creation or existence of any Permitted Exceptions or other Permitted Transfers, or (2) any action with respect to any Project Agreements to the extent permitted by § 4.04.



The amount of any "Release Price" received by the Lender shall be applied to the principal of the Note, provided that if such amount exceeds the principal of the Note then outstanding, the excess shall be held by the Lender in a Cash Collateral Account and thereafter applied by the Lender (A) so long as no Event of Default has occurred and is continuing, to future advances of principal under the Note as and when made, or (B) if an Event of Default has occurred and is continuing, to any Obligations of the Borrower under the Loan Documents at such time or times and in such manner as the Lender deems appropriate. Upon payment in full of all Obligations of the Borrower and



-3-

IMB00250

termination of all obligations of the Lender under the Loan Documents (including obligations of the Lender under any Set Aside Letters issued by the Lender hereunder) and all Letters of Credit, the Lender shall release its interest in any amounts then held in any such Cash Collateral Account.

The Borrower shall at all times use its best efforts to market and sell Units in compliance with the terms of this Agreement.

4.06   Personal Property.  The Borrower shall not (a) install or otherwise use or acquire for use in connection with the Collateral or the Project any Personal Property (including replacement Personal Property pursuant to clause (iii) below) which is not owned by the Borrower free and clear of all Liens (including conditional sale contracts) and Rights of Others (other than Permitted Exceptions) or which is not a part of the Collateral, or (b) cause or permit the removal from the Land (or, in the case of offsite improvements, from the location of installation) of any Personal Property which is installed or otherwise used or acquired for use in connection with the Collateral or the Project, except that so long as no Event of Default has occurred and is continuing, this clause (b) shall not prohibit (i) the temporary removal of Personal Property for repairs in the ordinary course of business, (ii) the removal of Personal Property of insignificant value which is not reasonably necessary or appropriate to the completion of the Project, or (iii) the removal of defective or worn out Personal Property which has been replaced by other Personal Property of equal or greater suitability and value which is intended for the same purpose.  Upon removal of any Personal Property in compliance with clauses (ii) and (iii) above, the Borrower shall be permitted to transfer or otherwise dispose of such Personal Property as the Borrower may determine.

4.07   Liens and Taxes.  The Borrower shall (a) pay, prior to delinquency, all Taxes which are or may become a Lien affecting any of the Collateral, and not consent to any Special Taxes which affect or may affect any of the Collateral, (b) keep the Collateral free and clear of all Liens and Rights of Others, subject only to Permitted Exceptions and Permitted Transfers, (c) promptly pay or cause to be paid, and obtain valid and enforceable lien releases or waivers (together with invoices or receipts identifying the nature of each payment) from all Lien Claimants, (d) to the extent permitted by applicable Laws, diligently file or procure the filing of valid notices of completion upon completion of construction of any Improvements and a notice of cessation of labor upon cessation of construction for a continuous period of 30 days or more, and take all other steps necessary to forestall the assertion of Lien Claims, and (e) pay and perform when due all other obligations secured by or constituting a Lien affecting any of the Collateral, except that the Borrower shall not be required to pay or perform any such Taxes, Lien Claims or other obligations which are being actively contested in good faith by appropriate proceedings, provided that the Borrower has posted such security for the payment or performance of such Taxes, Lien Claims or other obligations as the Lender may reasonably require and, by reason of nonpayment, none of the Collateral or any Lien or other interest of the Lender under the Loan Documents is prejudiced or in danger of being sold, foreclosed or otherwise lost or forfeited.

In the event that a stop notice is asserted against the Lender or any action or other proceeding is instituted to enforce any Lien (including any mechanics lien, and whether or not such Lien constitutes a Permitted Exception) against any of the Collateral, the Borrower shall immediately make such payments, obtain such surety

4

IMB00251

bonds and/or take such other action as the Lender may reasonably require in order to release the stop notice or Lien. Upon failure of the Borrower to release any such stop notice, the Lender may, at its option, file an interpleader action to resolve any pending claims.

The Borrower irrevocably appoints the Lender as its agent (such agency being coupled with an interest) to file any notices (including notices of completion and cessation of labor) that the Lender deems appropriate in order to protect its interests under the Loan Documents.

4.08   Property and Liability Insurance. The Borrower shall at all times maintain the following policies of insurance:

(a)   with respect to any Improvements as to which construction has commenced but has not been completed and any Personal Property used or to be used in connection with such Improvements, builder's "all risk" insurance ("completed value" form), including "course of construction" coverage;

(b)   with respect to any Improvements as to which construction has been completed and any other Improvements now or in the future located on the Land and any Personal Property used or to be used in connection with such Improvements, property "all risk" fire and extended coverage insurance (including coverage for vandalism and malicious mischief but without coverage restriction for vacancy);

(c)   commercial general liability insurance in favor of the Borrower (and naming the Lender and its Affiliates as additional insureds) in an aggregate amount not less than $2,000,000.00 (or such greater amount as may be specified by the Lender from time to time) combined single limit; and

(d)   such other insurance as may be required by applicable Laws (including worker's compensation and employer's liability insurance) or as the Lender may reasonably require from time to time (including comprehensive form boiler and machinery insurance, if applicable).

The Borrower shall also cause the Contractor, if any, and each subcontractor to maintain all policies of worker's compensation and employer's liability insurance required by applicable Laws, and a policy of commercial general liability insurance and, upon request by the Lender, shall cause the Architect and any engineer engaged in connection with the Project to maintain all of worker's compensation and employer's liability insurance required by applicable Laws, and a policy of professional liability and errors and omissions insurance, in each case for such periods and in such amounts and with such deductible amounts as the Lender may reasonably require from time to time.

Each policy of property insurance required by this § 4.08 shall be in an amount not less than the full replacement cost of the property covered by such policy, shall contain a "full replacement cost" endorsement, shall insure against flood loss risk if the Land is located in a Flood Hazard Area, shall insure against loss due to earthquake and earth movement if required by the Lender, and shall name the Lender and its Affiliates as "loss payee" pursuant to form BFU 438 or other form approved by the Lender. Each

5

IMB00252

policy of commercial general liability insurance required by this §4.08 shall cover personal injury, property damage, owner/contractor protective, blanket contractual liability and (where applicable) completed operations, with x, c and u exclusions deleted, and such insurance shall be primary and non-contributing with any other insurance available to the Lender. All insurance policies shall be in form and substance and issued by insurers reasonably satisfactory to the Lender, and shall contain such deductibles and such endorsements as the Lender may reasonably require. Upon request by the Lender from time to time, the Borrower shall deliver to the Lender originals or copies of all such insurance policies and certificates evidencing such policies.

4.09    Title Insurance and Searches.  The Borrower shall deliver to the Lender, in form and substance satisfactory to the Lender, a Title Policy, such endorsements to the Title Policy and such preliminary title reports and other title or lien searches (including UCC searches) and tax service contracts as the Lender may reasonably require from time to time.

4.10    Books, Records and Inspections.  The Borrower shall at all times maintain (a) full and complete books of account and other records with respect to the Collateral and the Project and its business and operations, (b) complete copies of the Improvement Plans (including all Change Orders), all Project Agreements and all Authorizations issued in connection with the Collateral or the Project, (c) a complete file of all invoices, receipts and lien releases and waivers obtained by the Borrower with respect to amounts paid for Project Costs, and (d) the Condominium Declaration, and shall permit the Lender and its agents, upon request from time to time, to inspect and copy any of such books, records and other Documents and to, enter and inspect the Real Property and any other Collateral and all work and materials furnished in connection with the Project.

4.11    Construction Information and Reporting Requirements.  The Borrower shall cause to be delivered to the Lender, in form and detail satisfactory to the Lender:

(a)    promptly after discovery by the Borrower, notice of (i) any fact or circumstance that may or will cause the Project Costs associated with any Line Item to exceed or be less than the corresponding amount set forth in the Project Budget or the Line Item Budget by more than 5%, or that may or will cause any Project Costs for any matters not covered by specific Line Items to exceed, in the aggregate, $50,000, (ii) any failure of the Project or the Improvements to be in substantial conformity with the Improvement Plans and in compliance in all material respects with all applicable Laws and Other Requirements, (iii) any actual or anticipated material delays in construction, (iv) any serious threat or the commencement of any action or other proceeding (including any action to foreclose or otherwise enforce any Lien Claim or other Lien and any proceedings in condemnation or eminent domain) affecting or relating to any of the Collateral or the Project, (v) the occurrence or allegation of any termination, material breach or default, or failure of any material condition or other requirement under the Architect Agreement, the Construction Contract, if any, or any Financing Commitment, (vi) any dispute between the Borrower and any Governmental Agency relating to any of the Collateral or the Project, the adverse determination of which could adversely affect the Collateral or the Project in any material respect, (vii) any injury or damage to or loss or destruction of any of the Collateral if the cost of repair, restoration or replacement exceeds $25,000, (viii) any imposition of or proposal for any Special Taxes which affect or may

6

IMB00253

affect any of the Collateral, (ix) any material adverse change in the financial condition, operations, properties or prospects of any Loan Party, (x) any event which has or may have a material adverse impact on the Collateral or the Project, (xi) the occurrence of any Event of Default or event which, with the giving of notice and/or the passage of time, could become an Event of Default, and (xii) any Change Order required by Section 4.02.

(b)     promptly after receipt by the Borrower, copies of all notices or other communications delivered to the Borrower or the Real Property which are addressed to the Lender or to "construction lender";

(c)     on or before the 15th day of each month, a report on a form approved by the Lender describing sales activities for the Project as of the end of the prior month;

(d)     after the end of each fiscal year for each Loan Party, Financial Statements for such Loan Party for and as at the end of such fiscal year, and upon request by the Lender from time to time, quarterly Financial Statements and Tax Returns for each Loan Party and copies of any audited Financial Statements prepared for any Loan Party, in each case certified in a manner acceptable to the Lender as more fully defined in Exhibit "C" of this Agreement; and

(e)     such other Documents or Information relating to any Loan Party, the Collateral, the Project or the transactions contemplated by the Loan Documents as the Lender may reasonably request from time to time.

The Lender is authorized at any time and from time to time to directly contact the Contractor, if any, or any subcontractor or other Lien Claimant or potential Lien Claimant or other Person to verify any Information provided by the Borrower or for any other purpose.

4.12    Costs, Fees and Expenses.  The Borrower shall bear sole responsibility for and promptly pay, or cause to be paid, all costs and expenses relating to the performance by the Borrower of its Obligations or the delivery to the Lender of any Documents or other items or information under or in connection with any of the Loan Documents, and any Taxes (other than income taxes of the Lender), costs, expenses, fees or charges payable or determined to be payable in connection with the execution, delivery, filing or recording of, or otherwise with respect to, any Loan Document or any other Document delivered under or in connection with any Loan Document.

The Borrower shall pay the Loan Fee to the Lender at or prior to the time of recordation of the Mortgage, and shall pay to the Lender on demand all costs, expenses and charges of the Lender in connection with the approval of the Loan by the Lender and the negotiation, preparation, execution, delivery, administration, supplement, modification, amendment, waiver and enforcement of, and any other action taken by the Lender under or otherwise to protect its rights and interests in respect of, any Loan Document, and any litigation, dispute, action or other proceeding (including bankruptcy proceedings) relating thereto, including recording fees, filing fees, search fees, reconveyance fees, title insurance premiums, appraisal, engineering, inspection and consulting fees, the reasonable fees and disbursements of the Lender's legal counsel and other out-of-pocket expenses, the reasonable charges of the Lender's internal legal

7

IMB00254

counsel, and any fees or other charges of the Lender for appraisals or inspections or for review of appraisals, budgets, plans and specifications or other matters relating to the Project or the Collateral.

The Borrower shall also pay to the Lender, as a condition to the issuance by the Lender of any Set Aside Letter or Letter or Letter of Credit or any extension or modification thereof, the applicable Set Aside Letter Fee or Letter of Credit Fee and/or the applicable extension or modification fee, as the case may be.

Any amount payable to the Lender under any of the Loan Documents (including any amount payable under this § 4.12) which is not paid on the date when due shall, from and after such date, bear interest at the Alternate Rate until paid. Such interest shall be payable by the Borrower to the Lender immediately and without demand.

4.13   Indemnification by the Borrower.  The Borrower shall indemnify, defend and save and hold harmless the Lender and its Affiliates, and the respective directors, officers, agents, attorneys and employees of each (collectively the "Indemnitees") from and against, and shall pay on demand, any and all losses, liabilities, damages, costs, expenses and charges (including the reasonable fees, charges, and disbursements of internal and external legal counsel) suffered or incurred by any Indemnitee as a result of (a) any failure of the Borrower to perform any of its Obligations under any Loan Document, (b) any failure of any Representation by the Borrower to be correct in all respects when made, (c) injury or death to persons or damage to property or other loss occurring on or in connection with the Collateral or the Project, whether caused by the negligence or any other act or omission of the Borrower or any Lien Claimant or any other Person or by negligent, faulty, inadequate or defective design, building, construction or maintenance or any other condition or otherwise, (d) any claim of any surety in connection with any bond relating to construction of any improvements or offsite improvements, and (e) any claim, demand or cause of action, or any action or other proceeding, whether meritorious or not, brought or asserted against any Indemnitee which relates to or arises out of the Loan Documents, the Loan, any Set Aside Letter or Letter of Credit or any disbursement thereunder, the Collateral, the Project or any transaction contemplated by, or the relationship between, the Borrower and the Lender or any action or inaction by the Lender under, the Loan Documents, provided that no Indemnitee shall be entitled to indemnification under this § 4.13 for matters caused solely by such Indemnitee's gross negligence or willful misconduct. Any obligation of the Borrower under this § 4.13 shall survive the making and repayment of the Loan and the expiration or termination of this Agreement and shall be secured by the Mortgage for so long as the Mortgage remains a lien upon the Real Property, and shall continue as an unsecured obligation of the Borrower thereafter.

4.14   Additional Covenants.  The Borrower shall perform each of the obligations (if any) set forth in Exhibit "C", in the manner and within the time limits set forth therein.

4.15   Actions and Further Assurances.  The Borrower shall appear in and defend all actions and other proceedings purporting to effect any of the Collateral or the Project or the rights or interests of the Lender under the Loan Documents (and the Lender may, at the Borrower's expense, appear in and defend any such action or other proceeding as the Lender may determine), and the Borrower shall take or cause to be taken such further action and execute and deliver or cause to be executed and delivered such further Documents as the Lender from time to time may reasonably require to

8

IMB00255

maintain, perfect, protect, assure and confirm the Lender's rights and interests (including rights and interests in the Collateral), the Borrower's Obligations and the intention of the parties under the Loan Documents.

4.16    Performance by the Lender.  If the Borrower fails to perform any of its Obligations under any Loan Document and the Lender reasonably determines that remedial action is necessary to protect the rights or interests of the Lender, the Lender may, without notice to or demand on the Borrower, perform any such Obligations in such manner and to such extent and take such other  action as the Lender may deem appropriate, and all costs, expenses and charges of the Lender relating to any such action shall be payable by the Borrower to the Lender in accordance with § 4.12.

4.17.    Loan to Value  Ratio.'   At any time following the occurrence and continuance of an Event of Default, Lender may elect to reappraise the Real Property in accordance with Lender's then applicable appraisal and underwriting guidelines. The Borrower shall reimburse Lender for the reasonable cost of any such appraisal. If, based upon such appraisal, the actual ratio established (a) of the Loan Amount less the total of all Borrower's Funds previously deposited by Borrower with Lender pursuant to this provision, (b) to the value of the Real Property then encumbered by the Mortgage, exceeds the Loan to Value Ratio, then the Borrower shall (i) defer payments of project overhead or other development related soft costs and if insufficient, (ii) deposit with the Lender, on demand, additional Borrower's Funds in an amount deemed necessary by the Lender to reduce the ratio of the amount described in (a) to the amount described in (b) of this provision to the Loan to Value Ratio. Any Borrower's Funds deposited with Lender pursuant to this provision shall be held in a Cash Collateral Account in which Lender has a valid perfected first priority security interest and, at Lender's sole discretion may be applied to reduce the principal amount of the Loan, or shall be disbursed by the Lender to pay Project Costs which would have been paid out of the Loan prior to further Disbursements of the Loan.  In no event shall Lender be obligated to make Disbursements of the Loan which, in the aggregate, exceed the Lender's then most recent determination of the value of the Real Property then encumbered by the Mortgage pursuant to this provision multiplied by the Loan to Value Ratio (expressed in decimal form).

4.18    Sales of Units.  The Borrower shall not enter into any contract to sell or transfer a Unit other than an Acceptable Sale Contract.  Not later than the time any Unit is Closed, the Borrower shall pay or cause to be paid to Lender the Release Price .   The Release Price will be applied against indebtedness due under the Note, under this Agreement and under the Loan Documents, and may be allocated to principal, interest, or other charges or indebtedness, if any then due, thereunder as Lender in its sole discretion may determine.

Each and every time during the term of the Loan that Borrower enters into a contract to sell or transfer a Unit, Borrower agrees that, (a) such contract shall be deemed collaterally assigned pursuant to the Assignment of Project Documents described on Exhibit C attached hereto; and (b)  simultaneously upon executing such contract, Borrower shall execute and deliver to Lender such additional documents required by Lender to evidence such collateral assignment all of Borrower's rights under said contract to Lender.  Each such additional document shall be on a form approved by Lender in its sole discretion.

9

IMB00256

5.00   <u>Representations of the Borrower</u>.  The Borrower represents and warrants to the Lender that:

5.01   <u>Formation and Qualification</u>.  Each Loan Party which is a corporation is duly incorporated, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and is duly qualified in Florida; each Loan Party which is a limited liability company, partnership, trust or other entity is duly formed and validly existing under the Laws of the jurisdiction of its formation and, in the case of a limited liability company or limited partnership formed under the Laws of a jurisdiction other than Florida, is duly registered in Florida; each Loan Party which is a corporation, limited liability company, or limited partnership is in good standing in Florida; and each Loan Party has all requisite power and authority to conduct its business and to own and lease its properties.

5.02   <u>Loan Documents</u>.  The execution, delivery and performance of the Loan Documents by each Loan Party are within such Loan Party's power and authority, have been duly authorized by all necessary action and do not and will not (a) require any Authorization which has not been obtained (except to the extent indicated in § 5.05(b) with respect to Authorizations required in connection with the Collateral or the Project), (b) contravene the Charter Documents of any Loan Party, any applicable Laws or Other Requirements or any agreement or restriction binding on or affecting any Loan Party or its property, or (c) result in or require the creation or imposition of any Lien or Right of Others upon or with respect to any property now or in the future owned by any Loan Party (other than Liens in favor of the Lender).  No Authorization which has not been obtained is required for the creation of the Liens or the enforcement by the Lender of its Remedies under the Loan Documents.  Each Loan Document, when executed and delivered, will constitute the legal, valid and binding obligations of each Loan Party which is a party to or bound by such Loan Document, enforceable against such party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or other similar Laws affecting the rights of creditors generally.

5.03   <u>Finder's or Broker's Fees</u>.    Except as otherwise disclosed in Part B of Exhibit "C", (a) no finder's, broker's or other fee or compensation of any kind is payable to any Person in connection with the Loan, and (b) the payment of any such fee disclosed in Part B of Exhibit "C" is the sole responsibility of the Borrower and such fee has been (or upon recordation of the Mortgage will be) paid in full by the Borrower.  The Borrower hereby indemnifies and holds harmless the Lender from any claims, liability, damages, costs or expenses (including without limitation the fees and expenses of legal counsel) resulting from or arising out of any claims or assertions by any Person (including without limitation any broker, agent, financial advisor or other intermediary) for any finder's, broker's or other fee or compensation of any kind in connection with the Loan.  Such indemnification obligation on the part of the Borrower shall survive termination of the Loan Documents.

5.04   <u>Collateral</u>.  The Borrower has and will continue to have (or upon recordation of the Mortgage will have and from and after such recordation will continue to have) good and marketable title to the Collateral, free and clear of all Liens and Rights of Others, subject only to Permitted Exceptions and Permitted Transfers.  Upon recordation of the Mortgage and filing of the financing statement executed by the Borrower, the Mortgage will create a valid and indefeasible first priority perfected Lien in the Collateral securing the payment and performance of all Obligations, subject only to

10

Permitted Prior Exceptions and Permitted Transfers. No financing statements covering any of the Collateral are on file in any public office, except financing statements in favor of the Lender and any other financing statements approved by the Lender in writing.

5.05    Project Information. (a) The Borrower and, to the best knowledge of the Borrower, any Governmental Agency having jurisdiction over the Land, have complied in all material respects with all applicable Laws and Other Requirements relating to the division and development of the Real Property, and the Borrower is, and the construction of the Improvements in accordance with the terms of this Agreement will be, in compliance in all respects with all applicable Laws and Other Requirements relating to the Collateral or the Project. (b) Except as otherwise disclosed in Part B of Exhibit "C", (i) all Authorizations required in connection with the Collateral or the Project have been regularly and finally received (other than routine permits for work which has not yet commenced and any required certificates of occupancy or other approvals of construction by any Governmental Agency which (in each case) are to be issued on a ministerial basis as required from time to time during the course of construction and after completion), and (ii) the development and use of the Real Property for its intended purpose do not require the payment of extraordinary fees or assessments or the construction of other improvements, will not contravene any applicable Laws or Other Requirements, and are not subject to any other legal, contractual or practical impediments which are material in the aggregate. (c) The Project Budget and any Line Item Budget delivered to the Lender are based on information deemed reliable by the Borrower and represent the Borrower's best estimate of all Project Costs that will be required in connection with the Project, and all Project Costs shown in the Project Budget or any such Line Item Budget as "Previously Paid By Borrower" have been paid in full. (d) All Utility Services, streets, walks and other offsite improvements relating to or adjoining the Land or necessary for the development of the Project and the occupancy of the Real Property for its intended purpose have been or will be promptly completed and/or otherwise made available at no further expense to the Borrower (except for costs relating to such work reflected in the Project Budget for "Site Development") and are not and will not be subject to any conditions or restrictions which may adversely affect the Collateral or the Project in any material respect. (e) The approximate acreage of the Land is correctly set forth in § 1.00 and, except as otherwise disclosed in Part B of Exhibit "C", (i) the Land is not located in a Flood Hazard Area, nor is the Land subject to or affected by any existing or proposed Special Taxes (other than Special Taxes approved in writing by the Lender after the date of this Agreement), and (ii) each Unit (together with any undivided interests in common areas to be transferred to the purchaser of such Unit) and any common areas to be transferred to a homeowners association are separately transferable in compliance with all applicable subdivision Laws and Other Requirements. (f) Except as otherwise disclosed in writing to the Lender, the Architect Agreement and the Construction Contract, if any, are in full force and effect and free from any material breach or default by any party. (g) The Declarations are, or upon completion and recording thereof will be, in full force and effect and (i) the assignment of the Declarations to the Borrower and the collateral assignment thereof to the Lender have been, or will be, consented to by all necessary parties, (ii) Borrower is not in default under any of the Declarations, has satisfied, or will satisfy, all of its obligations under the Declarations required to be performed as of the date hereof, and does not anticipate any impediments to the satisfaction of any of its obligations under the Declarations required to be performed after the date hereof, (iii) the condominium association contemplated under the Declarations will, prior to the Closing

11

of the first sale of a Unit, be validly formed, and (v) Borrower shall not finalize or record the Declarations without the prior written consent of Lender.

5.06    Financial Information.  (a) The Financial Statements of each Loan Party which have been furnished to the Lender fairly present such Loan Party's financial condition as at the dates of such Financial Statements and the results of operations for the periods covered by such Financial Statements in accordance with generally accepted accounting principles consistently applied (or such other method of preparation approved by the Lender in writing), and since the respective dates of such Financial Statements, there has been no material adverse change in the financial condition, operations, properties or prospects of such Loan Parties.  (b) Each Loan Party has filed all tax returns required to be filed by it, and has paid all Taxes due pursuant to such returns or in respect of any of its properties (except for any such Taxes which are being actively contested in good faith by appropriate proceedings), and to the best knowledge of each Loan Party, no basis exists for additional assessments which have not been adequately reserved against in the Financial Statements referred to above or otherwise disclosed in writing to the Lender.

5.07    Litigation and Other Matters.  Except as otherwise disclosed in writing to the Lender, (a) no actions or other proceedings affecting or relating to the Collateral or the Project are pending or, to the best knowledge of each Loan Party, threatened, (b) no actions or other proceedings are pending or, to the best knowledge of each Loan Party, threatened against or affecting any Loan Party or any property of any Loan Party which, if determined adversely to such Loan Party, could materially impair the financial condition, operations, properties or prospects of such Loan Party or the ability of such Loan Party to perform its obligations under the Loan Documents, and (c) the Borrower has given notice to the Lender of any other matters which the Borrower is required to disclose to the Lender under § 4.11(a).

5.08  .  Documents and Other Information.  All Documents and other information delivered to the Lender pursuant to any of the Loan Documents are and will be complete and correct in all material respects at the time of delivery to the Lender.

5.09    Competing Projects.  The Borrower hereby represents and warrants that neither the Borrower nor any of its affiliates has or intends to construct, create, arrange, develop, purchase or sell any residential housing improvements (or units which are components hereof) which constitute a Competing Project.

5.10    Compliance with Laws.  Without in any way limiting any of Borrower's other representations, warranties or covenants contained in this Agreement, Borrower hereby represents, warrants and covenants that the Improvement Plans are, and the construction of the Improvements according thereto will be, in compliance with all applicable federal, state and local laws, rules, regulations, ordinances and codes, including without limitation the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et. seq., as amended, and the Fair Housing Act, 42 U.S.C. § 3601, et. seq., as amended.

6.00    Events of Default and Remedies of the Lender.

6.01    Events of Default.  The occurrence of any one or more of the following events shall constitute an Event of Default:

12

IMB00259

(a)    the Borrower shall fail to pay all or any portion of the principal of the Note when due; or

(b)    the Borrower shall fail to pay any installment of interest on the Note when due, or shall fail to pay any other amount payable by the Borrower to the Lender under the Loan Documents (including any deposit of Borrower's Funds required by the Disbursement Schedule) within 20 days after the date when due, or the Borrower shall fail to pay all accrued interest and all other amounts then payable by the Borrower to the Lender under the Loan Documents on the Maturity Date or the date of final payment of the principal of the Note in full; or

(c)    any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed and either (i) such failure shall continue for more than 30 days after notice of such failure is given by the Lender to such Loan Party, unless such failure is not reasonably capable of being cured within such 30-day period (but is reasonably capable of being cured within 60 days after such notice) and such Loan Party commences action to cure such failure within such 30-day period and diligently and continuously prosecutes such action to completion and causes such failure to be cured within 60 days after such notice, or (ii) such failure is not reasonably capable of being cured within 60 days after notice of such failure is given by the Lender to such Loan Party; or

(d)    any Representation proves to have been incorrect in any material respect when made; or

(e)    work relating to construction of the Improvements ceases for 15 consecutive days for any reason other than acts of God or other causes beyond the reasonable control of the Borrower, or such work ceases for 45 consecutive days for any reason; or

(f)    the Borrower is enjoined by any court or other Governmental Agency from constructing the Improvements or selling Units or performing any Obligations and such injunction continues unreleased and unstayed for 45 days; or

(g)    all or a substantial or material portion of the Collateral is damaged or destroyed by fire or other casualty and the Lender has reasonably determined that the security of the Mortgage has been impaired or that the repair, restoration or replacement of the Collateral in accordance with the requirements of the Mortgage is not economically practicable or is not likely to be completed prior to the Maturity Date; or all or a substantial or material portion of the Collateral is condemned, seized or appropriated by any Governmental Agency or subject to any action or other proceeding instituted by any Governmental Agency for any such purpose; or

(h)    any Loan Party is dissolved or liquidated or merged with or into any other Person; or for any period of more than 10 days any Loan Party which is a corporation, limited liability company, partnership, trust or other entity ceases to

13

IMB00260

　
exist in its present form and (where applicable) in good standing and duly qualified under the Laws of the jurisdiction of its incorporation or formation and Florida; or any Loan Party who is an individual dies or becomes incapacitated; or all or substantially all of the assets of any Loan Party are sold or otherwise transferred; or

(i)      any Loan Party ceases to be managed and controlled by the Person or Persons who manage and control such Loan Party as of the date of this Agreement, or any Loan Party assigns or attempts to assign any rights or interests under any Loan Document without the prior written consent of the Lender; or any Loan Document becomes or is claimed by any Loan Party to be unenforceable against any Loan Party; or the Mortgage shall cease to constitute a valid and indefeasible first priority perfected Lien in the Collateral, or any sale, transfer or encumbrance of all or any portion of the Collateral occurs in violation of Section 4.05, subject only to Permitted Prior Exceptions and Permitted Transfers; or

(j)      any Loan Party is subject to an order for relief by the bankruptcy court, or is unable or admits in writing its inability to pay its debts as they mature or makes an assignment for the benefit of creditors; or any Loan Party applies for or consents to the appointment of any receiver, trustee or similar official for it or for all or any part of its property (or any such appointment is made without its consent and the appointment continues undischarged and unstayed for 60 days); or any Loan Party institutes or consents to any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, custodianship, conservatorship, liquidation, rehabilitation or similar proceeding relating to it or to all or any part of its property under the Laws of any jurisdiction (or any such proceeding is instituted without its consent and continues undismissed and unstayed for 60 days); or any judgment, writ, warrant of attachment or execution or similar process is issued or levied against any of the Collateral or any other property of any Loan Party and is not released, vacated or fully bonded within 60 days after its issue or levy; or

(k)      any Guarantor purports to revoke, cancel or terminate its Guaranty prior to the termination date (if any) provided therein; or

(l)      any material adverse change shall occur in the financial condition, operations, properties or prospects of any Loan Party, or any event shall occur which has a material adverse impact on the Collateral or the Project;or

(m)      any Loan Party is in default or an event of default has occurred (with respect to any loan or other obligation owing by Loan Party to Lender) or on Loan Party's debt with any other lender.

6.02    Remedies of the Lender.  Upon the occurrence of any Event of Default, the Lender may, without notice to or demand upon the Borrower, which are expressly waived by the Borrower (except for notices or demands otherwise required by applicable Laws to the extent not effectively waived by the Borrower and any notices or demands specified in the Loan Documents), exercise any one or more of the following Remedies as the Lender may determine:

14

IMB00261

(a)    the Lender may, at its option, terminate all commitments to make Disbursements or issue Set Aside Letters or cause the issuance of Letters of Credit, or to release any Collateral from the Mortgage, or the Lender may waive the Event of Default or, without waiving, determine, upon terms and conditions satisfactory to the Lender, to make further Disbursements or issue further Set Aside Letters or cause the issuance of further Letters of Credit, or to release any Collateral from the Mortgage;

(b)    the Lender may declare the unpaid principal of the Note and all accrued interest and other amounts payable under the Loan Documents to be immediately due and payable, in which event all such amounts shall immediately be due and payable without protest, presentment, notice of dishonor, demand or further notice of any kind, all of which are expressly waived by the Borrower;

(c)    the Lender may demand from the Borrower, and upon such demand the Borrower shall pay to the Lender, for placement in a Cash Collateral Account, in addition to all other amounts payable by the Borrower under the Loan Documents, an amount equal to the sum of (i) the maximum aggregate unfunded potential liability of the Lender under all Set Aside Letters then outstanding, and (ii) the maximum aggregate amount that could be drawn under all Letters of Credit then outstanding, assuming strict compliance with all conditions to drawing;

(d)    the Lender may perform any of the Borrower's Obligations in such manner as the Lender may determine;

(e)    the Lender may foreclose upon the Collateral by judicial action ;

(f)    the Lender may, either directly or through an agent or court-appointed receiver, take possession of the Collateral and enter into such contracts and take such other action as the Lender deems appropriate to complete or partially construct all or any part of the Improvements, subject to such modifications and changes in the Project or the plan of development as the Lender may deem appropriate;

(g)    the Lender is authorized at any time and from time to time to the fullest extent permitted by applicable Laws, and without notice or demand, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or account of the Borrower against any and all obligations of the Borrower under this Agreement; and

(h)    the Lender may proceed to protect, exercise and enforce any and all other Remedies provided under the Loan Documents or by applicable Laws.

All costs, expenses, charges and advances of the Lender in exercising any such Remedies (including any such amounts which cause the obligations of the Borrower to exceed the face amount of the Note) shall be payable by the Borrower to the Lender in accordance with § 4.12.

15

IMB00262

Each of the Remedies of the Lender provided in the Loan Documents is cumulative and not exclusive of, and shall not prejudice, any other Remedy provided in the Loan Documents or by applicable Laws. Each Remedy may be exercised from time to time as often as deemed necessary by the Lender, and in such order and manner as the Lender may determine. No failure or delay on the part of the Lender in exercising any Remedy shall operate as a waiver of such Remedy, nor shall any single or partial exercise of any Remedy preclude any other or further exercise of such Remedy, or of any other Remedy. No application of payments, or any advances or other action by the Lender, will cure or waive any Event of Default or prevent acceleration, or continued acceleration, of amounts payable under the Loan Documents or prevent the exercise, or continued exercise, of any Remedies of the Lender.

   7.00   Miscellaneous.

   7.01   Waivers and Amendments.   No supplement to, modification or amendment of, or waiver, consent or approval under, any of the Loan Documents shall be effective unless in writing and signed by the Lender, and any waiver, consent or approval shall be effective only in the specific instance and for the specific purpose for which given.

   7.02   Survival of Representations.  All Representations shall survive the making and repayment of the Loan and the expiration or termination of this Agreement and have been or will be relied upon by the Lender, notwithstanding any investigation made by the Lender or on its behalf.

   7.03   Notices.  All notices and other communications provided under any Loan Document shall be in writing and mailed or personally delivered to the appropriate party at the address set forth on the signature page of this Agreement or any other Loan Document or, as to any party, at any other address in the State of Florida as shall be designated by it in a written notice sent to the other party.  All notices and other communications by the Borrower which are expressly subject to receipt by the Lender under the terms of the Loan Documents will be effective when received by an officer or other representative of the Lender having direct responsibility for administration of the Loan.  In all other cases, any notice or other communication will be effective (a) if given by mail, on the earlier of receipt or the third day after deposit in the United States mails with first-class postage prepaid, or (b) if given by personal delivery, when delivered, provided that the requirements of this sentence shall not impair or delay the effectiveness of any notice or other communication given by the Lender under the Mortgage or any Additional Collateral Agreements when such notice or other communication is given in compliance with and would otherwise be effective under applicable Laws.

   7.04   Relationship of Parties.  The relationship between the Borrower and the Lender is, and at all times shall remain, solely that of debtor and creditor, and shall not be, or be construed to be, a joint venture, equity venture, partnership or other relationship of any nature.

   7.05   Nonliability of the Lender.  The Borrower acknowledges and agrees that:

16

IMB00263

(a)     the Borrower shall be solely responsible for and shall rely solely on its own judgment with respect to all matters relating to the Collateral or the Project, including the conduct of the Borrower and its agents and employees, the quality, adequacy and suitability of the Improvement Plans and any Change Orders and any work or materials furnished or to be furnished in connection with the Project, the skill, qualifications and performance of architects, contractors, subcontractors and suppliers, the feasibility of the Project and the sufficiency of budgets, cost projections and insurance, the supervision, status and progress of construction and compliance by the Borrower with the requirements of this Agreement with respect to such construction and the accuracy and completeness of all Disbursement Requests, Set Aside Letter Requests and Letter of Credit Requests, and the Lender does not assume any responsibility to the Borrower or any other Person to review, inspect, supervise or approve, or to provide any advice or information with respect to, any such matters;

(b)     Inspections of construction made by or on behalf of the Lender, and acceptance, approval or review by the Lender of any Documents, information, conditions or performance or any other action by the Lender under any of the Loan Documents, are for purposes of administration of the Loan only and for the sole protection of the Lender, and shall not constitute a representation or warranty by the Lender to the Borrower or any other Person or be relied upon by the Borrower or any other Person for any other purpose;

(c)     the Lender shall have no responsibility or liability for any delays in funding or construction caused by any inspection of construction or review of Documents, information, conditions or performance or any other action by the Lender in connection with any Disbursement or Change Order;

(d)     the Lender does not owe any duty of care to protect the Borrower or any other Person against or to inform the Borrower or any other Person of, and the Lender shall not be responsible or liable to the Borrower or any other Person for any loss, damage, liability or claim of any kind relating to injury or death to persons or damage to property or other loss resulting from the negligence or any other act or omission of the Borrower or any Lien Claimant or any other Person or any negligent, faulty, inadequate or defective design, building, construction or maintenance or any other condition or the improper application of any Disbursements; and

(e)     the provisions set forth in this Agreement for the issuance of Letters of Credit are included solely as an accommodation to the Borrower and shall not constitute an agreement, commitment, guarantee or other assurance by the Lender that any such Letters of Credit are available or will be issued on the terms set forth herein or otherwise, and the Lender shall in no event have any liability or obligation to the Borrower, or be subject to any setoff, counterclaim or other defense, as a result of the failure, inability or unwillingness of the Lender to designate one or more LC Banks hereunder or to request or cause any LC Bank to issue any Letters of Credit hereunder.

7.06    Benefits and Assignment.    The Loan Documents are made for the purpose of defining the rights and obligations of the Loan Parties and the Lender in connection with the Loan and are intended for the sole protection of the Loan Parties

17

IMB00264

and the Lender and the Lender's successors and assigns, and no other Person shall have any rights of any nature under or by reason of the Loan Documents. The Loan Documents shall be binding on and inure to the benefit of each of the Loan Parties and the Lender and their respective successors and assigns, except that no Loan Party shall have the right to assign any rights or interests under any Loan Document without the prior written consent of the Lender. The Lender may from time to time sell participations in the Loan to any Person (including Affiliates of the Lender) without notice to or the consent of any Loan Party.

7.07    Payments and Computations.  All payments by any Loan Party under the Loan Documents shall be made in lawful money of the United States free and clear of, and without reduction by reason of, any Taxes. Any payment which is stated to be due on a day which is not a Banking Day shall be made on the next succeeding Banking Day, and any such extension shall be included in the computation of the payment of interest. Whenever any interest or other amount payable under the Loan Documents is to be computed on the basis of a year of a specified number of days, the amount shall be calculated on the basis of a year of such specified number of days for the actual number of days (including the first, but excluding the last) occurring in the period for which such calculation is made. For purposes of calculating amounts paid or payable under the Loan Documents, credit for payments shall be given upon receipt of same day funds by the Lender at its office located at 3465 E. Foothill Blvd., FH-01-09, Pasadena, California 91107, Attention: Homebuilder Division (or such other location specified by the Lender from time to time in writing) at or before the close of business, Los Angeles time, on any Banking Day. Except as otherwise expressly provided in the Loan Documents, all payments on the Obligations received by the Lender shall be applied to the Obligations in such order and manner as the Lender may determine.

7.08    Publicity.  During the course of construction of the Improvements and until the Loan is repaid in full, the Lender may place signs on the Land and issue or publish releases or announcements stating that construction financing is being provided by the Lender to the Borrower.

7.09    Obligations Absolute.  The obligations of the Borrower under this Agreement with respect to any Letter of Credit or Set Aside Letter (including the obligation to pay or reimburse to the Lender any and all amounts paid thereunder and interest thereon) shall be unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement and the Note under all circumstances, including without limitation the following circumstances:

(a)    any lack of validity or enforceability of this Agreement, any Letter of Credit or Set Aside Letter or any other agreement or instrument relating thereto (this Agreement and all of the other foregoing being collectively referred to herein as the "Related Documents");

(b)    any change in the time, manner or place of payment of, or in any other term of, any or all of the obligations of the Borrower in respect of any Related Document or any other amendment or waiver of or any consent to departure from any Related Document;

(c)    the existence of any claim, setoff, defense or other right that the Borrower may have at any time against any beneficiary or any transferee of a

13

Letter of Credit or Set Aside Letter (or any Persons for whom any such beneficiary or any such transferee may be acting), the Lender, the LC Bank or any other Person, whether in connection with the transactions contemplated by the Related Documents or any unrelated transaction;

(d)      any statement or any other document presented under a Letter of Credit or Set Aside Letter proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(e)      payment by the LC Bank under a Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit;

(f)      any exchange, release or non-perfection of any collateral, or any release or amendment or waiver of or consent to departure from any guarantee, for any or all of the obligations of the Borrower in respect of the Related Documents; or

(g)      any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower or a guarantor.

7.10    Rules of Construction.  (a) For purposes of this Agreement and the other Loan Documents: (i) any reference to "days" or "months" shall mean calendar days or months, (ii) the word "including" shall mean "including without limitation", (iii) any reference in any of the Loan Documents to any Loan Document or other Document or exhibit shall mean such Loan Document or other Document or exhibit as it may from time to time be supplemented, modified, amended and extended in accordance with the terms of this Agreement, (iv) defined terms shall be equally applicable to the singular and plural forms, and (v) all existing and future exhibits to this Agreement are incorporated in this Agreement by this reference.  (b) Time is of the essence of the Loan Documents, and the provisions of the Loan Documents are declared to be severable. (c) All accounting terms used and not otherwise defined in any Loan Document shall be construed in conformity with, and all financial information maintained or submitted by any Loan Party or other Person under any Loan Document shall be prepared in accordance with, generally accepted accounting principles consistently applied (or such other principles approved by the Lender in writing). (d) If more than one Loan Party signs or is otherwise bound by any Loan Document, the liability of each shall be joint and several. (e) The Loan Documents shall be governed by, and construed and enforced in accordance with, the Laws of Florida.

7.11    Waiver of Jury Trial.  EACH OF THE LENDER AND THE BORROWER WAIVE TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING (INCLUDING COUNTERCLAIMS), WHETHER AT LAW OR EQUITY, BROUGHT BY THE LENDER OR THE BORROWER AGAINST THE OTHER ON MATTERS ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY TRANSACTION CONTEMPLATED BY, OR THE RELATIONSHIP BETWEEN THE LENDER AND THE BORROWER OR ANY ACTION OR INACTION BY EITHER PARTY UNDER, ANY OF THE LOAN DOCUMENTS.

[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

19

IMB00266

[SIGNATURE PAGE FOLLOWS]

20

IMB00267

IN WITNESS WHEREOF, the Borrower and the Lender have caused this Agreement to be duly executed as of the date first written above.

"LENDER":

INDYMAC BANK, F.S.B.

By _____

Title: _____VP_____

Lender's Address:

IndyMac Bank, F.S.B.
3465 E. Foothill Blvd., FH-01-09
Pasadena, California 91107
Attn: Homebuilder Division

"BORROWER":

BLUFF HOUSE, LLC, an
Illinois limited liability company

By: _____
Ganesan Visvabharathy, Manager

Borrower's Address:
101 Burr Ridge Parkway, Suite 306
Chicago, Illinois 60527

ANASTASIA SHORES, LLC, an
Illinois limited liability company

By: _____
Ganesan Visvabharathy, Manager

Borrower's Address:
101 Burr Ridge Parkway, Suite 306
Chicago, Illinois 60527

21

IMB00268

Loan No. 52-8300000

EXHIBIT "A"

LEGAL DESCRIPTION OF LAND

22

IMB00269

EXHIBIT A

Legal Description

PARCEL ONE: "BLUFF HOUSE" PHASE 1

A PARCEL OF LAND SITUATED IN GOVERNMENT LOT 2, SECTION 6, TOWNSHIP 4 SOUTH, RANGE 26 EAST, CLAY COUNTY, FLORIDA, SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE NORTHWEST CORNER OF LOT 10, BLOCK 1, MEADOWBROOK OAKS UNIT TWO, ACCORDING TO PLAT BOOK 16, PAGES 28, 29 AND 30 OF THE PUBLIC RECORDS OF SAID COUNTY; THENCE ON THE WEST LINE OF SAID SECTION 6, RUN NORTH 01 DEGREE 00 MINUTES 00 SECONDS WEST 850.00 FEET TO A WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF WELLS ROAD; THENCE ON SAID PROLONGATION AND THE ON SAID SOUTHERLY LINE OF WELLS ROAD, SOUTH 88 DEGREES 41 MINUTES 00 SECONDS EAST 508.80 FEET; THENCE SOUTH 01 DEGREE 00 MINUTES 00 SECONDS EAST 785.89 FEET TO THE NORTH LINE OF LOMBARD STREET; THENCE ON SAID LINE SOUTH 89 DEGREES 43 MINUTES 40 SECONDS WEST 406.00 FEET TO THE WEST LINE OF SAID LOMBARD STREET; THENCE ON LAST SAID LINE SOUTH 01 DEGREE 00 MINUTES 00 SECONDS EAST 50.00 FEET TO THE NORTH LINE OF SAID LOT 10, BLOCK 1, MEADOWBROOK OAKS UNIT TWO; THENCE ON LAST SAID LINE SOUTH 89 DEGREES 43 MINUTES 40 SECONDS WEST 102.42 FEET TO THE POINT OF BEGINNING.

PARCEL TWO: "ACCESS EASEMENT"

AN EASEMENT FOR INGRESS AND EGRESS COVERING A PARCEL OF LAND SITUATED IN GOVERNMENT LOT 2, SECTION 6, TOWNSHIP 4 SOUTH, RANGE 26 EAST, CLAY COUNTY, FLORIDA, SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE NORTHWEST CORNER OF LOT 10, BLOCK 1, MEADOWBROOK OAKS UNIT TWO, ACCORDING TO PLAT BOOK 16, PAGES 28, 29 AND 30 OF THE PUBLIC RECORDS OF SAID COUNTY; THENCE ON THE WEST LINE OF SAID SECTION 6, RUN NORTH 01 DEGREE 00 MINUTES 00 SECONDS WEST 850.00 FEET TO A WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF WELLS ROAD; THENCE ON SAID PROLONGATION, RUN THE FOLLOWING 2 COURSES: 1). SOUTH 88 DEGREES 41 MINUTES 00 SECONDS EAST 184.62 FEET TO THE POINT OF BEGINNING; 2) SOUTH 88 DEGREES 41 MINUTES 00 SECONDS EAST 27.84 FEET; THENCE NORTH 43 DEGREES 14 MINUTES 25 SECONDS EAST 15.94 FEET; THENCE NORTH 79 DEGREES 46 MINUTES 37 SECONDS EAST 19.00 FEET; THENCE SOUTH 88 DEGREES 10 MINUTES 02 SECONDS EAST 22.68 FEET TO THE WESTERLY LINE OF WELLS ROAD, ACCORDING TO PLAT BOOK 17, PAGES 7 THROUGH 12 OF SAID PUBLIC RECORDS; THENCE ON LAST SAID LINE NORTH 01 DEGREE 00 MINUTES 00 SECONDS WEST 28.85 FEET; THENCE NORTH 88 DEGREES 05 MINUTES 51 SECONDS WEST 77.00 FEET; THENCE SOUTH 03 DEGREES 23 MINUTES 05 SECONDS WEST 45.10 FEET TO THE POINT OF BEGINNING.

LP 787223.1\31849-50518

IMB00270

PARCEL THREE: "BLUFF HOUSE" PHASE 2

A PARCEL OF LAND SITUATED IN SECTION 6, TOWNSHIP 4 SOUTH, RANGE 26 EAST, CLAY COUNTY, FLORIDA; SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE NORTHWEST CORNER OF LOT 1, MEADOWBROOK UNIT 5, ACCORDING TO PLAT BOOK 6, PAGE 57 OF THE PUBLIC RECORDS OF SAID COUNTY; THENCE ON THE WEST LINE THEREOF, SOUTH 01 DEGREE 09 MINUTES 30 SECONDS EAST 43.04 FEET, TO THE NORTH LINE OF CEDAR BEND, ACCORDING TO PLAT BOOK 17, PAGES 7 THRU 12 OF SAID PUBLIC RECORDS; THENCE ON LAST SAID LINE, SOUTH 89 DEGREES 43 MINUTES 40 SECONDS WEST 340.00 FEET; THENCE NORTH 01 DEGREE 09 MINUTES 30 SECONDS WEST 3.30 FEET; THENCE SOUTH 89 DEGREES 43 MINUTES 40 SECONDS WEST 185.71 FEET TO THE EAST LINE OF CEDAR BEND DRIVE; THENCE ON LAST SAID LINE, RUN THE FOLLOWING TWO COURSES: 1) NORTH 01 DEGREE 00 MINUTES 00 SECONDS WEST 671.40 FEET; 2) ON THE ARC OF A CURVE CONCAVE SOUTHEASTERLY AND HAVING A RADIUS OF 30.00 FEET, A CHORD DISTANCE OF 43.28 FEET, TO THE SOUTH LINE OF WELLS ROAD, THE BEARING OF SAID CHORD BEING NORTH 45 DEGREES 09 MINUTES 30 SECONDS EAST; THENCE ON LAST SAID LINE SOUTH 88 DEGREES 41 MINUTES 00 SECONDS EAST, 529.83 FEET; THENCE SOUTH 01 DEGREE 14 MINUTES 15 SECONDS EAST 647.37 FEET; THENCE SOUTH 89 DEGREES 42 MINUTES 10 SECONDS WEST 37.74 FEET, TO THE POINT OF BEGINNING.

PARCEL FOUR: "ANASTASIA SHORES"

THE EAST 720 FEET OF GOVERNMENT LOT 2, SECTION 34, TOWNSHIP 7 SOUTH, RANGE 30 EAST, ST. JOHNS COUNTY, FLORIDA, EXCEPTING THEREFROM THE SOUTHERLY 508 FEET; ALL MORE PARTICULARLY DESCRIBED AS FOLLOWS:

FOR A POINT OF REFERENCE, COMMENCE AT THE NORTHWEST CORNER OF SAID SECTION 34, AS ESTABLISHED BY THE PLAT OF WOODLAND, UNIT A, AS RECORDED IN MAP BOOK 10, PAGES 68 AND 69 OF THE PUBLIC RECORDS OF SAID COUNTY; THENCE SOUTH 89 DEGREES 18 MINUTES 30 SECONDS EAST ALONG THE NORTH LINE OF SAID SECTION 34, THE SAME BEING THE SOUTH RIGHT OF WAY LINE OF POPE ROAD (AS NOW ESTABLISHED AS A 100 FOOT RIGHT OF WAY), A DISTANCE OF 1914.36 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE SOUTH 89 DEGREES 18 MINUTES 30 SECONDS EAST, ALONG SAID NORTH LINE OF SECTION 34, A DISTANCE OF 720.00 FEET; THENCE SOUTH 00 DEGREES 37 MINUTES 41 SECONDS WEST, ALONG EAST LINE OF AFOREMENTIONED GOVERNMENT LOT 2, THE SAME BEING THE WEST LINE OF THE LANDS AS RECORDED IN OFFICIAL RECORDS VOLUME 355, PAGE 213 AND PARCEL "G" OF OFFICIAL RECORDS VOLUME 454, PAGE 176 A DISTANCE OF 816.99 FEET; THENCE NORTH 89 DEGREES 22 MINUTES 55 SECONDS WEST, ALONG THE NORTH LINE OF THE AFOREMENTIONED SOUTHERLY 508 FEET, A DISTANCE OF 720.00 FEET; THENCE NORTH 00 DEGREES 37 MINUTES 41 SECONDS EAST PARALLEL WITH AND 720 FEET WESTERLY OF THE AFOREMENTIONED EAST LINE OF GOVERNMENT LOT 2, A DISTANCE OF 817.91 FEET TO THE POINT OF BEGINNING.

IMB00271

Loan No. 52-8300000

EXHIBIT "B"

DISBURSEMENT SCHEDULE

All Disbursements, Set Aside Letters and Letters of Credit shall be made or issued in accordance with the following terms, conditions and procedures:

(a)    Disbursement Account.    The following demand deposit account (the "Disbursement Account") has been opened at the _____ branch of _____ (the "Bank") in the name of the Borrower, subject to a security interest in favor of the Lender, which has been acknowledged in writing by the Bank. Account no. _____, ABA Number _____.

(b)    Method of Disbursement.    Subject to fulfillment of all applicable conditions and the terms and procedures set forth in the Agreement and this Disbursement Schedule: (i) each Disbursement shall be made on the basis of a Disbursement Request submitted (in duplicate) by the Borrower to the Lender, pursuant to which Borrower shall certify that the Project Costs covered by the Disbursement Request have been paid or incurred by the Borrower; and (ii) upon the Lender's approval of the Disbursement Request, the proceeds of the Disbursement shall be deposited into the Disbursement Account or, in the case of Disbursements for any Line Item for "Land," into an escrow designated by the Borrower and approved by the Lender, except that (A) the proceeds of any Disbursement to pay interest or other amounts owing to the Lender shall be made by book entry; and (B) at the Lender's option, Disbursements may otherwise be made by the Lender directly to the Borrower, to the Contractor, if any, or to any other Lien Claimant, or jointly to one or more of such Persons or to other Persons designated by the Borrower, or in such other manner as the Lender may approve or require, including, without limitation, through the title company.

(c)    Set Aside Letters and Letters of Credit.    Subject to fulfillment of all applicable conditions and the terms and procedures set forth in the Agreement and this Disbursement Schedule, the Lender shall issue Set Aside Letters from time to time and cause the LC Bank to issue Letters of Credit from time to time upon written request of the Borrower, provided that (i) the obligation of the Lender to issue any Set Aside Letter and the agreement of the Lender to cause the LC Bank to issue any Letter of Credit shall be subject to receipt by the Lender of the applicable Set Aside Letter Fee or Letter of Credit Fee and to the Lender's approval, in its sole discretion, of the form and substance of the Set Aside Letter or Letter of Credit and, except insofar as the purpose and maximum amount of the Set Aside Letter or Letter of Credit are set forth in Part C of Exhibit "C", the purpose and maximum amount of the Set Aside Letter or Letter of Credit, (ii) the issuance of any Letter of Credit shall be further subject to the consent and approval of the LC Bank in its sole discretion and to the approval by the Lender in its sole discretion of the terms and conditions of issuance, and the provisions for the issuance of Letters of Credit set forth herein shall in any event be subject to § 7.05(e) of the Agreement, and (iii) unless the Lender otherwise consents, (A) no Set Aside Letter shall obligate the Lender to advance funds after the Maturity Date, (B) no Letter of Credit shall have an expiration date after the Maturity Date, and (C) no Set Aside Letter or

23

IMB00272

Letter of Credit shall be issued if the Lender has reasonably determined that any Project Costs intended to be covered or secured by such Set Aside Letter or Letter of Credit are not likely to be incurred prior to the Maturity Date. The maximum amount that the Lender may be obligated to fund under any Set Aside Letter at any time plus any amounts actually funded by the Lender under any such Set Aside shall reduce, to that extent, the amount otherwise available to be disbursed or set aside for other Project Costs covered by the same Line Item, and any amount funded by the Lender under any Set Aside Letter shall be deemed to be a Disbursement of the proceeds of the Loan or Borrower's Funds (as the case may be) for purposes of the Agreement, the Note and the other Loan Documents (in each case regardless of whether the amount thereof plus all other Disbursements shall exceed the Loan Amount), except that the funding of any such amount shall not be subject to any conditions or requirements other than those set forth in the Set Aside Letter or Letter of Credit. Without limitation on the foregoing provisions of this paragraph (c), the Borrower acknowledges and agrees that (1) any disbursement by the LC Bank under any Letter of Credit represents an advance of the proceeds of the Loan to or for the account of the Borrower on behalf of the Lender, and (2) in consideration of the issuance of any such Letter of Credit and the obligation of the Lender to reimburse the LC Bank for any such disbursement thereunder, each such disbursement shall be deemed to be a Disbursement of the Loan (as described above) and the Borrower agrees to pay to the Lender the amount of each such disbursement, with interest thereon, on the terms set forth in the Note with respect to all Disbursements of the Loan (in each case regardless of whether the amount thereof plus all other Disbursements shall exceed the Loan Amount).

(d)    Line Item Budgets; Use of Proceeds.  The Borrower shall deliver to the Lender, prior to the earlier of the first Disbursement or the first Set Aside Letter or Letter of Credit, if any, requested by the Borrower (or prior to such later date as the Lender may approve in writing), a Line Item Budget for the Project.  Unless the Lender otherwise consents: (i) each Disbursement shall be made and used solely to pay or reimburse the Borrower for payment of, and each Set Aside Letter or Letter of Credit shall be issued solely with respect to, Project Costs associated with specific Line Items set forth in the Project Budget and any applicable Line Item Budget as specified in the Disbursement Request, and (ii) the total amount disbursed for Project Costs associated with any Line Item shall not exceed the corresponding amount set forth in the Project Budget and any applicable Line Item Budget (plus any amounts disbursed by the Lender for such purpose from "Contingency" in accordance with clause (B) below), and the amount of any Set Aside Letter or Letter of Credit issued in respect of any Line Item shall not exceed the corresponding amount set forth in the Project Budget and any applicable Line Item Budget less the total of all amounts previously disbursed or set aside (or secured by any Letter of Credit) for such Line Item.  For purposes of this paragraph: (A) Disbursements with respect to any Line Item for "Land" shall be made for the purchase price of the Land and any existing improvements (if not previously purchased by the Borrower) and payment of existing Liens affecting the Collateral (other than Permitted Exceptions), with any balance to be disbursed as directed by the Borrower, (B) Disbursements with respect to any Line Item for "Contingency" shall be available for cost overruns on specific Line Items or for Project Costs for matters not covered by specific Line Items shall not exceed the percent of hard costs complete as determined by Lender's most current inspection, subject in each case to the prior approval of the Lender, and (C) Disbursements with respect to any Line Item for "Developer Overhead" and "Project Indirects" shall not exceed the percent of hard costs complete as determined by Lender's most current inspection.

24

IMB00273

If the Borrower effects any cost savings with respect to any Line Item, the Borrower shall give notice to the Lender of such cost savings promptly upon the discovery of the same, whereupon the amount of such cost savings shall be transferred from the Line Item(s) in question to the "Contingency" Line Item, and shall thereafter be available for disbursement as stated in clause (B) above.

Unless the Lender otherwise consents, no modifications shall be made to the Project Budget or any Line Item Budget at any time, except that (i) the Project Budget shall be supplemented from time to time by any Line Item Budget approved by the Lender, and (ii) the Project Budget and any applicable Line Item Budget shall be appropriately modified by the Lender from time to time to reflect any increase in Project Costs for which additional Borrower's Funds have been deposited by the Borrower with the Lender in accordance with paragraph (f) below. Notwithstanding, no disbursements allocated in the Line Item Project for actual constructions costs shall be disbursed for any other line item or purpose until, Borrower, or Lender if made without Borrower's consent, has, given written notice of said decision (including the amount of the loan proceeds to be so disbursed) to the Contractor and any other lienor who has given a notice to owner, all pursuant to Section 713.3471, (2), Florida Statutes, and to the extent permitted by law, Borrower will hold Lender harmless from and indemnify Lender from any such liability to such Persons.

(e)     Disbursement, Set Aside Letter and Letter of Credit Procedures.   Each Disbursement (other than Disbursements to pay interest or other amounts owing to the Lender) and each Set Aside Letter or Letter of Credit shall be subject to the Lender, in form and substance satisfactory to the Lender, of each of the following items: (i) a Disbursement Request or Set Aside Letter Request or Letter of Credit Request, as the case may be, submitted (in duplicate) by the Borrower, certifying the status of construction of the Improvements and the amount requested (and the total of all amounts previously requested) with respect to each Line Item, and also certifying that no Event of Default has occurred and is continuing and that all Representations made by the Borrower in any of the Loan Documents are correct in all material respects as of the date of the Disbursement Request or Set Aside Letter Request or Letter of Credit Request, (ii) if requested by the Lender, a certificate or statement from the Contractor, if any, and/or the Architect with respect to the status of construction or the amount requested, (iii) originals or copies of such bills, invoices, receipts, lien releases or waivers or other evidence of payment or information as the Lender may reasonably require with respect to any Lien Claims or potential Lien Claims or the status of construction or amounts paid or payable for any Project Costs, (iv) to the extent that any Disbursement relates to costs for building materials, equipment or other Personal Property, evidence that such building materials, equipment or other Personal Property have been incorporated into the Improvements or have been delivered to the Borrower and stored and insured in a manner satisfactory to the Lender, (v) evidence of any insurance required by § 4.08 (if not previously furnished to the Lender) and, if requested by the Lender, evidence that any required Financing Commitment is in full force and effect, (vi) such endorsements to the Title Policy  and such other Documents and information relating to the Collateral or the Project as the Lender may reasonably request, (vii) in the case of the first Disbursement or Set Aside Letter or Letter of Credit only, the "Required Items" described in Exhibit "C", and (viii) to the extent provided in paragraph (d) above, any Line Item Budget required to be delivered to the Lender prior to the Disbursement or Set Aside Letter or Letter of Credit, and (ix) in the case of any

25

portion of the Loan which is subject to any "Retention Requirements" or other "Holdback Requirements" specified in Exhibit "C", such evidence as the Lender may require that all applicable conditions have been fulfilled.

Unless the Lender otherwise consents, not more than two Disbursements (other than Disbursements to pay interest or other amounts owing to the Lender) shall be made during any month. Unless otherwise paid by the Borrower, and notwithstanding paragraph (b) above, Disbursements for interest and other amounts owing to the Lender may be made by the Lender without further authorization from the Borrower.

Unless the Lender otherwise consents, the Lender shall not be obligated to make any Disbursement or issue any Set Aside Letter or cause any Letter of Credit to be issued if (A) the Lender has determined that an Event of Default has occurred or that an event which, with notice of the passage of time or both, would be an Event of Default has occurred or that any Representation made by the Borrower in any of the Loan Documents would not be correct in all material respects if made on and as of the date of the Disbursement or Set Aside Letter or Letter of Credit, or (B) the Lender has determined, based on inspections by or on behalf of the Lender or such other information as the Lender deems appropriate, that the construction of the Improvements is not substantially as represented by the Borrower or is not in compliance with the requirements of the Agreement, or (C) the Borrower has failed to deposit with the Lender any Borrower's Funds required by paragraph (f) below, or (D) the Lender is required under applicable Laws to withhold the Disbursement or Set Aside Letter or Letter of Credit or a stop notice has been asserted against the Lender and has not been fully released, or (E) the Lender has determined that any Liens or Rights of Others, other than Permitted Prior Exceptions, may have priority over the Mortgage with respect to the Disbursement or amounts that may be funded under the Set Aside Letter or Letter of Credit. Any liability of Lender to Contractor or other lienor giving notice to owner under Section 713.3471(1), Florida Statutes, resulting from Lender's failure to, within five (5) business days after such determination, give them written notice of any final determination of Lender, that Lender will cease further disbursements, shall not be asserted by Borrower.

(f)  Deposit of Borrower's Funds.  Prior to the first Disbursement or Set Aside Letter or Letter of Credit (or prior to such later date as the Lender may approve in writing), the Borrower shall deposit with the Lender Borrower's Funds in an amount equal to all "Additional Costs To Be Paid By Borrower" set forth in the original Project Budget, and the Borrower may from time to time deposit additional Borrower's Funds with the Lender as the Borrower deems appropriate to cover any increase in Project Costs. In addition, if the Lender at any time determines that any actual or estimated Project Costs have exceeded or can reasonably be expected to exceed the corresponding amount set forth in the Project Budget or any applicable Line Item Budget (whether as a result of Change Orders or otherwise), or that Project Costs for any matters not covered by specific Line Items have been or may be incurred by the Borrower, or that the undisbursed portion of the Loan (together with the undisbursed portion of all Borrower's Funds deposited with the Lender under this paragraph (f)) is or may be insufficient to pay all Project Costs that may be payable under the Loan Documents or otherwise required in connection with the Project (including a reasonable reserve for contingency, interest and other costs and expenses), then the Borrower shall deposit with the Lender, on demand, additional Borrower's Funds in an amount deemed reasonably necessary by the Lender to pay such Project Costs or to cover such

26

insufficiency. Any Borrower's Funds deposited with the Lender under this paragraph (f) shall be held in a Cash Collateral Account and shall be disbursed by the Lender prior to further Disbursements of the Loan.

(g)    Disbursement Controls.  Notwithstanding anything in this Exhibit "B" to the contrary, the disbursement controls shall be as follows:

| Disbursement Processing Description: | |
|---|---|
| Loan Admin Due Diligence Review | Prior to Disbursement |
| Backup Invoices for Hard Costs | Not Required |
| Backup Invoices for Soft Costs | Required |
| Conditional/Unconditional Lien Waivers | Not Required |
| Retention | Consistent with Building Contract |
| Inspection of Hard Cost Items | Prior to Disbursement |
| Title Endorsement | At disbursement |
| Borrower's Draw Request (HBD - CL Form) | Required |
| Frequency of Disbursement | 1-2 a month |
| Sales Verification | Monthly Sales Report |

27

IMB00276

EXHIBIT "C"

LOAN REQUIREMENTS

Borrower:     BLUFF HOUSE, LLC, an Illinois limited liability company
              ANASTASIA SHORES, LLC, an Illinois limited liability company

Project:      Bluff House/Anastasia Shores

Loan Amount: $46,850,000.00

Loan Fee:    $468,500.00, payable contemporaneously with the execution of this
             Agreement

A.  Required Items (to be furnished by the Borrower prior to the first Disbursement or
    Set Aside Letter):

    1.  Promissory Note in the face amount of $46,850,000.00 executed by the
        Borrower in favor of the Lender to evidence the Loan.

    2.  Construction Mortgage with Assignment of Rents, Security Agreement
        and Fixture Filing executed by the Borrower in favor of the Lender to
        secure the Loan and other Obligations of the Borrower, which shall cover
        the Real Property, certain Personal Property, the Project Agreements, the
        Improvement Plans and such other rights, properties and interests
        relating to the Project or any other Collateral as the Lender may require.

    3.  Financing statement executed by the Borrower in favor of the Lender with
        respect to such Collateral as the Lender may require.

    4.  Secured Environmental Indemnity executed by the Borrower.

    5.  General Guaranty of all Obligations of the Borrower executed by
        Ganesan Visvabharathy.

    6.  Completion Guaranty executed by Ganesan Visvabharathy.

    7.  Environmental Guaranty executed by Ganesan Visvabharathy.

    8.  Cash Collateral Agreement executed by Borrowers and consented to by
        the bank where the Cash Collateral Account is maintained.

    9.  Cash Collateral Agreement relating to net operating income executed by
        Borrowers.

    10.  Authorizing Resolutions for each Loan Party.

    11.  Charter Documents for each Loan Party.

28

IMB00277

12.    Opinion of counsel for the Loan Parties from Arnstein & Lehr, LLP (covering the due authorization, execution and delivery of the Loan Documents, the enforceability of the Loan Documents and such other matters as the Lender may reasonably require).

13.    Current Financial Statements for Ganesan Visvabharathy.

14.    Evidence of insurance required by § 4.08.

15.    Assignment of Project Documents executed by the Borrower.

16.    Copies of permits .

17.    Copy of preliminary title report and recorded exceptions.

18.    Evidence of compliance with zoning/zoning endorsement and other land use restrictions.

19.    Environmental investigative report prepared by Aerostar Environmental Services, Inc.

20.    Appraisal(s) prepared by the Lender or an appraiser approved by the Lender confirming the prospective market value of (A) the Anastasia Property, assuming completion of the improvements to be constructed on the Anastasia Property, to be not less than $30,280,000.00, and (B) the Bluff Property, assuming completion of the improvements to be constructed on the Bluff Property, to be not less than $32,900,000.00.

21.    Evidence of Utility Services.

22.    Copy of any proposed CC&R's or easements, when available.

23.    Copy of budget for homeowners association, when available.

24.    Statement of conditions for transfer of common areas to homeowners association, when available.

25.    Copies of preliminary Condominium Declarations, when available.

26.    List of bonds, security deposits, Set Aside Letters or Letters of Credit required in connection with the Project.

27.    Evidence of payment of all Project Costs "Previously Paid By Borrower" set forth in the Project Budget.

28.    Borrower's Funds in the form of cash deposits for all "Additional Costs To Be Paid By Borrower" set forth in the Project Budget.

29.    Evidence of recording/filing of Mortgage/financing statement.

IMB00278

30. Confirmation that Title Policy has been or will be issued at or prior to first Disbursement or Set Aside Letter.

31. Insured Closing Protection Letter from the title company addressed to Lender concerning the title agent, if applicable.

32. UCC searches showing financing statement executed by the Borrower to be a first priority filing.

33. Evidence that the Loan Fee and all closing costs payable by the Borrower under § 4.12 have been or will be paid at or prior to the recordation of the Mortgage.

34. Evidence that Borrower has contributed cash equity and/or mezzanine financing of at least $11,000,000.00 at the time of closing.

35. 2003 Tax Return Certification – Ganesan Visvabharathy.

36. Mezzanine Lender Loan Documents.

37. Firm Commitment from Fifth Third Bank for purchase of a participation in the amount of $14,850,000.00.

38. Receipt and review of final cost review.

B.   Additional Matters (including disclosure of finder's or broker's fees, Special Taxes, flood conditions, development conditions or impediments, pending or unissued consents and approvals, delayed delivery of Line Item Budgets and delayed deposit of Borrower's Funds): none.

C.   Set Aside Letters and Letters of Credit.   The Borrower anticipates that the following Set Aside Letter(s) and Letter(s) of Credit may be necessary or desirable in connection with the Project: not known at this time.

As a condition to the issuance of each Set Aside Letter and Letter of Credit, the Borrower shall pay to the Lender a nonrefundable Set Aside Letter Fee in an amount to be determined by Lender or a nonrefundable Letter of Credit Fee in an amount to be determined by Lender. Each such Set Aside Letter Fee or Letter of Credit Fee shall be fully earned when paid and shall not be refundable, in whole or in part, under any circumstances.

D.   Presale Requirements:

1. No sales of Units in any Building shall be closed and no common areas shall be transferred to any homeowners association until at least 50% of the Units in such Building have become "sold" Units.

2. Unless the Lender otherwise consents in writing, no "Model Units" shown on Exhibit "E" shall be sold or closed until all other Units in the Project of the same type have become "sold" Units or "closed" Units.

30

IMB00279

As used in Part D of this Exhibit: (a) a "closed" Unit means a Unit as to which title has been conveyed to the purchaser; and (b) a "sold" Unit means a Unit as to which a purchaser (other than the Borrower or an Affiliate of the Borrower) has entered into a binding agreement to purchase the Unit for an amount not less than the "Minimum Sales Price" set forth on Exhibit "E" and has paid a nonrefundable deposit to the Borrower, and escrow instructions have been executed by the Borrower and the purchaser.

E.    Holdback Requirements (other than any "Retention Requirements" specified below):

                                NONE

F.    Retention Requirements:    Retention shall be consistent with the Construction Contract, on a trade by trade basis in accordance with commercially reasonable custom in the area in which the Project is located.

G.    Financial Covenants:

1.    Borrower shall provide or cause to provide to Lender until the Loan is paid in full:

    a.  Financial Statement for Borrower after the end of each fiscal year end within 120 days prepared in accordance with generally accepted accounting principals consistently applied;

    b.  Financial Statement for Guarantor after the end of each fiscal year end within 120 days prepared in accordance with generally accepted accounting principals consistently applied;

    c.  Financial Statement for Borrower after the end of each quarter end within 45 days prepared in accordance with generally accepted accounting principals consistently applied;

    d.  Financial Statement for Guarantor after the end of each quarter end within 45 days prepared in accordance with generally accepted accounting principals consistently applied;

    e.  Federal Tax Returns with all schedules including K-1, if applicable, for Borrower within 30 days of filing;

    f.  Federal Tax Returns with all schedules including K-1, if applicable, for Guarantor within 30 days of filing;

2.    Borrower acknowledges that net worth is a significant consideration to Lender in connection with the making of the Loan. Accordingly, Borrower agrees that the failure by Ganesan Visvabharathy to maintain the following financial capabilities shall constitute an Event of Default.

    a.  tangible net worth of Ganesan Visvabharathy as of the end of each calendar year in an amount not less than Thirty-Five Million ($35,000,000.00). Tangible Net Worth shall mean the excess of Assets over Liabilities, excluding, however from the determination of Assets: (i) all assets that would be classified as intangible assets under GAAP, including without limitation,

31

goodwill (whether representing the excess of cost over book value of assets acquired or otherwise), negative goodwill, patents, trademarks, trade names, copyrights, franchises and deferred charges (including without limitation, unamortized debt discount and expense, organization costs and research and development costs); and (ii) subordinated debt.

b.   liquid assets of Ganesan Visvabharathy not less than Three Million Dollars ($3,000,000.00) as of the end of each calendar quarter through and including December 30, 2005 and not less than Six Million Dollars ($6,000,000.00) commencing December 31, 2005 and as of the end of each calendar quarter thereafter. Liquid assets shall mean cash or readily marketable publicly traded securities traded or nationally recognized public exchange.

H.   Other Requirements: [If none, state "none"]

1.   Condominium Declaration.   Prior to the closing of the first Unit, the Borrower shall record the Condominium Declaration for the Project which Condominium Declaration shall be subject to Lender's approval, which approval shall not be unreasonably withheld.

2.   Absorption Rate.   Commencing in the seventh month after the date of this Agreement, the Borrower shall cause not less than 18 Units per month to be sold during each three-month period, calculated on a rolling three-month basis.

3.   Sales Start Date.   The Borrower shall cause the first Unit to be available for sale no later than 240 days after the date of this Agreement.

4.   Speculative Units.   Borrower shall not cause, suffer or permit the number of Speculative Units to exceed 40 at any time.   A Speculative Unit shall be defined as Unit that is incomplete and unsold.

5.   Standing Inventory.   Borrower shall not cause, suffer or permit the number of Standing Inventory Units to exceed 40 at any time.   A Standing Inventory Unit shall be defined as Unit that is complete and unsold.

6.   Maximum Number of Units Under Construction.   N/A.

7.   Letter of Credit.   As additional security for the Obligations, Borrower shall obtain a letter of credit in a face principal amount of not less than $1,000,000.00 from a bank acceptable to Lender and having a maturity date of at least 30 days after the Maturity Date.   Within two (2) weeks of the initial disbursement of the Loan, Borrower shall provide Lender with written confirmation of such letter of credit from LaSalle Bank National Association.   Notwithstanding anything to the contrary contained in this Agreement, Lender shall be under no obligation to make any further disbursements of the Loan unless and until Lender receives such written confirmation.   Failure of Borrower to provide Lender with such written confirmation within two (2) weeks of initial disbursement shall be an Event of Default under this Agreement without any further action by Lender.   The

IMB00281

beneficiary of such letter of credit shall be IndyMac Bank, F.S.B., as agent for Lender and Mezzanine Lender. The beneficiary shall have the right to draw on such letter of credit on demand at any time, whether before or after an Event of Default. The proceeds of such letter of credit shall be used first, to pay off the Obligations relating to this Loan, then, after the Obligations relating to this Loan have been paid in full, to pay off Borrower's obligations to Mezzanine Lender.

33

— IMB00282

Loan No. 52-8300000

EXHIBIT "D"

| Cost Category | Total Project Costs | Total Loan Proceeds | Cash Equity | Deferred Equity/Home Sales Cash Flow |
|---|---|---|---|---|
| **Land (1000)** | **$45,600,000** | **$34,600,000** | **$11,000,000** | **$0** |
| Land Cost | $45,600,000 | $34,600,000 | $11,000,000 | $0 |
| Land Cost Other | $0 | $0 | $0 | $0 |
| **Site Costs (2000)** | **$0** | **$0** | **$0** | **$0** |
| Overall Sitework | $0 | $0 | $0 | $0 |
| Site Costs Other | $0 | $0 | $0 | $0 |
| **Direct Construction Costs (3000)** | **$6,748,000** | **$3,454,148** | **$0** | **$3,293,852** |
| Direct Construction Costs | $6,748,000 | $3,454,148 | $0 | $3,293,852 |
| **Indirect Construction Costs (4000)** | **$2,660,446** | **$2,660,446** | **$0** | **Cash Flow)** |
| Developer O/H (3% of sales max) | $1,671,000 | $1,671,000 | $0 | $0 |
| Arch/Engineering | $38,750 | $38,750 | $0 | $0 |
| Contractor Fee | $0 | $0 | $0 | $0 |
| Permits & Fees | $0 | $0 | $0 | $0 |
| Project Indirects (3% of costs max) | $423,620 | $423,620 | $0 | $0 |
| Taxes/Ins. Bonds/Misc | $494,576 | $494,576 | $0 | $0 |
| Legal/ Acctg/ Misc. | $32,500 | $32,500 | $0 | $0 |
| **Sales / Marketing Costs (5000)** | **$1,878,533** | **$1,878,533** | **$0** | **$0** |
| On-going Marketing/Advertising | $1,646,533 | $1,646,533 | $0 | $0 |
| Start-Up Marketing | $232,000 | $232,000 | $0 | $0 |
| Model Landscape/Furnishing | $0 | $0 | $0 | $0 |
| **Financing Costs (6000)** | **$3,689,119** | **$3,689,119** | **$0** | **$0** |
| Interest Reserve (w/o mezzanine) | $2,869,244 | $2,869,244 | $0 | $0 |
| Loan Fee - HBD | $819,875 | $819,875 | $0 | $0 |
| Loan Fee - Mezzanine | $0 | $0 | $0 | $0 |
| **General Contingency (7000)** | | | | |
| Contingency | $567,764 | $567,764 | $0 | $0 |
| **Total** | **$61,143,862** | **$46,850,000** | **$11,000,000** | **$3,293,852** |

34

IMB00283

Loan No. 52-8300000
(First Mortgage)

EXHIBIT "E"

MINIMUM RELEASE PRICES

|  | Approximate Unit Size | No. of Units | Minimum Release Prices |
|---|---|---|---|
| Anastasia Shores | 908 SqFt | 164 | $183,000.00 |
| Bluff House | 825 SqFt | 68 | $101,000.00 |
| Bluff House | 1,200 SqFt | 126 | $123,500.00 |
| Bluff House | 1,250 SqFt | 72 | $128,500.00 |
| Bluff House | 1,510 SqFt | 26 | $146,500.00 |
| Total No. of Units |  | 456 |  |

The "Release Price" for each Lot/Unit shall be the greater of the amount shown in this Exhibit "E" or 100% of the net sales price (which shall mean the total sales price less (A) the lesser of (i) reasonable and customary closing costs paid by the Borrower including sales commissions, escrow fees, title insurance premiums, transfer taxes, prorations for real property taxes and other similar charges, or (ii) 6% of the total sales price, less (B) payments to Mezzanine Lender as permitted by Lender).

*IMB00284*

Loan No. 52-8300000

EXHIBIT "F"

DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

"Acceptable Sales Contract" means a firm and binding sale contract for a Unit, in form and substance previously approved by Lender, subject to changes thereto requested by the purchaser and agreed to by Borrower exercising prudent business judgment, and, in addition to complying therewith and with any other applicable provision of this Agreement, such sale contract shall (a) be entered into with a financially responsible purchaser, (b) provide that the purchase price for such Unit be not less than the Minimum Sales Price applicable to such Unit, (c) require purchaser to make a non-refundable earnest money deposit of not less than 5% of the amount of the Sales Contract, (d) provide for closing of such Unit upon substantial completion of the Unit or, if said Unit is substantially completed on the date Borrower and the purchaser enter into such purchase contract, within six (6) months from the date of said purchase contract and (e) not contain any conditions precedent to the purchaser's obligations thereunder which have not been satisfied or waived by such purchaser.

"Additional Collateral Agreements" means the "Additional Collateral Agreements" (if any) specified in Exhibit "C" and any other mortgages, assignments or other agreements (other than the Mortgage) now or in the future securing the Loan or any Guaranty.

"Affiliate" means, as to any Person, any other Person that directly or indirectly controls or is controlled by or under common control with the Person specified.

"Agreement" means this Building Loan Agreement, including all exhibits.

"Alternate Rate" means the "Alternate Rate" set forth in the Note.

"Anastasia Property" shall have the meaning set forth in § 1.00 of this Agreement.

"Architect" means any Person engaged by the Borrower from time to time as an architect or to perform similar functions in connection with the Project.

"Architect Agreement" means, as to any Architect, the agreement between the Borrower and the Architect relating to services to be provided by the Architect in connection with the Project.

"Authorization" means any authorization, consent, approval, order, license, permit, exemption or other action by or from, or any filing, registration or qualification with, any Governmental Agency or other Person.

"Authorizing Resolutions" means (a) in the case of a corporation, a certified copy of resolutions adopted by its board of directors, (b) in the case of a partnership

36

IMB00285

(whether general or limited), a certificate signed by all of its general partners; and (c) in the case of a trust or any other entity, evidence of such other action as the Lender may require, in each case authorizing the execution, delivery and performance of all Loan Documents to which it is a party or by which it is bound.

"Banking Day" means any day (excluding Saturdays and Sundays) on which banks located in Florida are not authorized or required by law to close.

"Bluff Property" shall have the meaning set forth in § 1.00 of this Agreement.

"Borrower's Funds" means funds of the Borrower deposited with the Lender (including funds received by Borrower from Mezzanine Lender) pursuant to the Disbursement Schedule.

"Building" means individually, and "Buildings" mean collectively, each building constructed on the Land as part of the Project within which the Units will be located.

"Cash Collateral Account" means a cash collateral account maintained by the Lender for the account of the Borrower for purposes of this Agreement or any of the other Loan Documents which shall be subject to a security interest in favor of the Lender for the purpose of securing the Borrower's Obligations and over which the Lender shall have sole and exclusive control and right of withdrawal.

"Change Order" means a change in, or supplement to, the Improvement Plans.

"Charter Documents" means (a) in the case of a corporation, its articles of incorporation and bylaws, (b) in the case of a limited liability company, its articles of organization and operating and/or management agreement, (c) in the case of a partnership, its partnership agreement and any certificate or statement of partnership, and (d) in the case of a trust or any other entity, its formation documents, in each case as amended from time to time.

"Closed Unit" means a Unit as to which title has been conveyed, pursuant to an Acceptable Sales Contract, to a bona fide purchaser.

"Collateral" means all property in which the Lender is granted or purportedly granted a Lien pursuant to the Mortgage.

"Competing Project" means any residential housing improvements or units which are located within a radius of five (5) miles of the Project .

"Condominium Declaration" shall mean, individually, and "Condominium Declarations" shall mean, collectively, the documents by which the Project will be submitted to the Florida Condominium Statute (the "Act"), prepared in accordance with the Act and which establishes the rights and easements in connection with the Project for the benefit of all future owners of the Unit.

"Construction Contract" means, as to any Contractor, the agreement between the Borrower and the Contractor relating to services to be provided by the Contractor in connection with the Project.

37

IMB00286

"Contractor" means any Person engaged by the Borrower from time to time as a general contractor in connection with the Project.

"Cost Savings" means the excess, if any, of any Line Item over the actual Project Costs incurred in connection with the work associated with such Line Item, as determined by the Lender after such work has been completed and all such Project Costs have been paid in full and all Lien Claims and potential Lien Claims relating to such work have been released or otherwise discharged to the satisfaction of the Lender.

"Declarations" means the Condominium Declarations and those declarations (and supplemental declarations) of covenants, conditions and restrictions described in the Title Policy (or subsequently recorded by or on behalf of the Borrower with the Lender's prior written consent) and governing the development of the Project.

"Disbursement" means each disbursement of the proceeds of the Loan and each disbursement of any Borrower's Funds in accordance with the Disbursement Schedule or any Set-Aside Letter or Letter of Credit. Without limitation on the foregoing, any amount funded by the Lender under any Set Aside Letter or disbursed by the LC Bank under any Letter of Credit shall be deemed to be a disbursement of the proceeds of the Loan (or, in the case of any Set Aside Letter, a disbursement of Borrower's Funds, if applicable).

"Disbursement Account" has the meaning set forth in paragraph (a) of the Disbursement Schedule.

"Disbursement Request" means a written request for a Disbursement in a form approved by the Lender.

"Disbursement Schedule" means the "Disbursement Schedule" attached as Exhibit "B".

"Documents" means written documents and materials, including agreements, approvals, certificates, consents, instruments, financing statements, reports, budgets, forecasts and opinions.

"Environmental Indemnity" means the Environmental Indemnity executed by the Borrower in favor of the Lender and described in Exhibit "C".

"Events of Default" means the events set forth in § 6.01.

"Financial Statements" means balance sheets and income statements.

"Flood Hazard Area" means an area which has been designated as a special flood hazard area or subject to comparable risks by the Federal Emergency Management Agency or any successor to such Agency.

"Governmental Agency" means (a) any government or municipality or political subdivision of any government or municipality, (b) any assessment, improvement, community facilities or other special taxing district, (c) any governmental or quasi-governmental agency, authority, board, bureau, commission, corporation,

IMB00287

department, instrumentality or public body, (d) any court, administrative tribunal, arbitrator, public utility or regulatory body, or (e) any central Lender or comparable authority.

"Guarantor" means any Person who has executed or is required to execute a Guaranty, and such Person's successors and assigns.

"Guaranty" means any Guaranty executed in favor of the Lender and described in Exhibit "C".

"Improvement Plans" means the improvement plans and specifications described in Exhibit "C", as modified by any Change Orders approved by the Lender.

"Improvements" means the Units and other Improvements, including site development work (if any), constructed or to be constructed pursuant to the Improvement Plans.

"Land" means the land described in Exhibit "A".

"Laws" means all federal, state and local laws, rules, regulations, ordinances and codes.

"LC Bank " means a bank designated by the Lender as the LC Bank in connection with any Letter of Credit to be issued under this Agreement.

"Letter of Credit" means a standby letter of credit issued by an LC Bank for the account of the Lender, or for the account of the Borrower and the Lender, in favor of a surety, Governmental Agency or other Person approved by the Lender, to secure the payment of Project Costs by the Borrower or the payment or performance of other obligations of the Borrower in connection with the Project, in each case as approved by the Lender in its sole discretion.

"Letter of Credit Fee" means a nonrefundable fee to be paid by the Borrower to the Lender as a condition to the issuance of any Letter of Credit, in each case in the amount set forth in Exhibit "C".

"Letter of Credit Request" means a written request for a Letter of Credit in a form approved by the Lender.

"Lien" means any lien, mortgage, Mortgage, pledge, security interest or other charge or encumbrance.

"Lien Claim" means (a) any mechanics lien affecting any of the Collateral, (b) any stop notice affecting the undisbursed portion of the Loan or any Borrower's Funds, (c) any right of any Person to assert or maintain any such mechanics lien or stop notice, and (d) any other claim to payment by any Lien Claimant.

"Lien Claimant" means the Contractor, if any, and any other Person who has furnished labor, service, equipment or material in connection with the Project or who is otherwise entitled to payment for any Project Costs.

IMB00288

"Line Item" means each of the separate Items set forth in the Project Budget and in any Line Item Budget.

"Line Item Budget" means a budget for the Project in form and substance satisfactory to the Lender and setting forth in such detail as the Lender may require the nature and amount of all Project Costs anticipated in connection with the Project as such budget may be modified from time to time in accordance with the Disbursement Schedule.

"Loan" means the loan to be made by the Lender to the Borrower pursuant to this Agreement in an amount not to exceed the Loan Amount.

"Loan Amount" means the amount of the Loan set forth in § 1.00.

"Loan Documents" means this Agreement, the Note, the Mortgage, the Environmental Indemnity, the Guaranties, if any, and any Additional Collateral Agreements, as the same may be amended, renewed or extended from time to time.

"Loan Fee" means a nonrefundable loan fee to be paid by the Borrower to the Lender at or prior to the time of recordation of the Mortgage in the amount set forth in Exhibit "C".

"Loan Party" means (a) the Borrower, (b) any Guarantor which at the time has or may have any obligation or liability (whether fixed, contingent or otherwise) under the Guaranty executed or to be executed by it, (c) any Person executing any Additional Collateral Agreements, and (d) in the case of any Loan Party which is a partnership, any general partner of such Loan Party.

"Loan to Value Ratio" means seventy-four and fifteen hundredths percent (74.15%).

"Maturity Date" means the maturity date of the Note, as such maturity date may be extended pursuant to this Agreement.

"Mezzanine Lender" shall mean IBA, LLC, a Delaware limited liability company.

"Mortgage" means the Construction Mortgage with Assignment of Rents, Security Agreement and Fixture Filing executed by the Borrower to secure the Loan.

"Note" means the Promissory Note executed by the Borrower in favor of the Lender to evidence the Loan.

"Obligations" means all obligations of the Borrower of every nature under the Loan Documents.

"Other Requirements" means (a) the terms, conditions and requirements of all Project Agreements, Authorizations and Rights of Others relating to the Collateral or the Project and all other Documents, agreements and restrictions relating to, binding on or affecting the Collateral or the Project, including the Declarations and other covenants, conditions and restrictions, leases, easements, reservations, rights and rights-of-way, (b) requirements relating to the sale or transfer of individual Units or

40

common areas or portions of common areas or the supply of Utility Services to the Real Property, (c) requirements and recommendations of the soils report and any environmental impact report or negative declaration, (d) all building, zoning, land use, planning and subdivision requirements, and (e) requirements relating to construction of any offsite improvements or any construction contemplated by any Set Aside Letter or Letter of Credit.

"Parking Spaces" shall mean a parking space in the Project which may either be a Unit or a limited common element.

"Permitted Exceptions" means (a) Liens in favor of the Lender, (b) Permitted Prior Exceptions, and (c) other matters expressly approved by the Lender in writing which are subject and subordinate to the Lien of the Mortgage.

"Permitted Prior Exceptions" means (a) general ad valorem real property taxes which are not delinquent, (b) Special Taxes described in Part B of Exhibit "C" or otherwise approved in writing by the Lender which in each case are not delinquent, (c) mechanics liens affecting the Real Property and arising from the construction of the Improvements, over which the Title Policy has insured the priority of the Lien of the Mortgage, and (d) such other matters as the Lender shall expressly approve in writing as "Permitted Prior Exceptions" for purposes of this Agreement.

"Permitted Transfer" means (a) any sale or other transfer of Units and common areas (or undivided interests in common areas) and the disposition of any excess proceeds of sale, in each case to the extent permitted by § 4.05, and (b) any transfer or other disposition of Personal Property permitted by § 4.06.

"Person" means any person or entity, whether an individual, trustee, corporation, partnership, limited liability company, joint stock company, trust, unincorporated organization, bank, business association or firm, joint venture, Governmental Agency or otherwise.

"Personal Property" means tangible personal property and fixtures, including building materials and supplies, appliances, furnishings, equipment and other "Goods" (as defined in the Mortgage), but excluding construction equipment of a type intended for use in connection with other projects.

"Project" means the project for the acquisition and/or refinancing of the Land, the construction of the Improvements, the acquisition and installation of certain Personal Property and the development of the Land in accordance with the Improvement Plans, and the marketing and sale of Units.

"Project Agreements" means (a) the Architect Agreement, the Construction Contract, if any, any Financing Commitment and any other takeout, refinancing or permanent loan commitment issued or assigned to the Borrower with respect to the Real Property, and (b) all leases, rental agreements, service and maintenance agreements, purchase and sale agreements, purchase options and other agreements of any nature relating to the Collateral or the Project, including agreements with contractors, subcontractors, suppliers, project managers and supervisors, designers, architects, engineers, sales agents and consultants, and (c) the Condominium Declarations.

41

IMB00290

"Project Budget" means the budget for the Project attached as Exhibit "D", as supplemented by each Line Item Budget approved by the Lender from time to time, in each case as modified from time to time in accordance with the Disbursement Schedule.

"Project Costs" means all costs and expenses of any nature relating to the Project or the financing of the Project.

"Real Property" means the Land and the Improvements and all other buildings, structures and improvements now or in the future located on the Land.

"Remedy" means any right, power or remedy.

"Representations" means the representations and warranties of the Borrower set forth in § 5.00 and all other representations, warranties and certifications to the Lender in the Loan Documents or in any other Document delivered under or in connection with the Loan Documents.

"Right of Others" means, as to any property in which a Person has an interest, any legal or equitable claim or other interest (other than a Lien but including a leasehold interest, a right of first refusal or a right of repossession or removal) in or with respect to such property held by any other Person, and any option or right held by any other Person to acquire any such claim or other interest or any Lien in or with respect to such property.

"Set Aside Letter" means (a) a letter from the Lender to a surety setting forth the Lender's undertaking to fund Project Costs for construction of Improvements to be bonded by the surety in connection with the Borrower's development of the Project, or (b) a letter from the Lender to a Governmental Agency setting forth the Lender's undertaking to fund Project Costs for construction of Improvements in connection with the Borrower's development of the Project.

"Set Aside Letter Fee" means a nonrefundable fee to be paid by the Borrower to the Lender as a condition to the issuance of any Set Aside Letter, in each case in the amount set forth in Exhibit "C".

"Set Aside Letter Request" means a written request for a Set Aside Letter in a form approved by the Lender.

"Sold Unit" means a Unit subject to a binding contract between Borrower and a contract purchaser which is an Acceptable Sales Contract.

"Special Tax" means, as to any property, (a) any special assessment or other Tax which is or may become a Lien affecting such property, other than general ad valorem real property taxes, and (b) any assessment, improvement, community facilities or other special taxing district in or into which such property is or may be located or incorporated or under which any special assessment or other Tax which is or may become a Lien affecting such property is or may be imposed.

42

IMB00291

"Taxes" means all taxes, assessments, charges, fees and levies (including interest and penalties) imposed, assessed or collected by any Governmental Agency.

"Title Policy" means an ALTA extended coverage lender's policy of title insurance in form and substance satisfactory to the Lender, issued by an insurer selected by the Borrower and satisfactory to the Lender, together with such endorsements and policies of coinsurance and/or reinsurance as may be required by the Lender, in a policy amount equal to the Loan Amount, insuring the Mortgage to be a valid first priority Lien on the Land and showing the Land to be subject only to Permitted Prior Exceptions.

"Unit" shall mean each residential condominium unit (and, in the event the Condominium Declaration establishes parking spaces as units, each Parking Space) within the Project.

"Utility Services" means all utility services, including water, gas, electricity, telephone, garbage removal and sewer services.

43

IMB00292

PLAINTIFF'S
EXHIBIT

3

Loan No. 52-8300000

## GENERAL GUARANTY

### (Real Estate Secured Loan)

TO:  INDYMAC BANK, F.S.B.

THIS GENERAL GUARANTY ("Guaranty"), dated July 28, 2005, is made by Ganesan Visvabharathy, individually (the "Guarantor"), in favor of INDYMAC BANK, F.S.B. (the "Lender"), and is executed pursuant to the Building Loan Agreement dated as of the date of this Guaranty among the Lender and BLUFF HOUSE, LLC, an Illinois limited liability company and ANASTASIA SHORES, LLC, an Illinois limited liability company (individually and collectively, the "Borrower") (such Building Loan Agreement, as it may from time to time be supplemented, modified and amended, being referred to in this Guaranty as the "Agreement"), the provisions of which are incorporated in this Guaranty by reference. The Agreement provides, among other things, for rules of construction which apply to this Guaranty. Capitalized terms used in this Guaranty and not otherwise defined are used with the meanings set forth in the Agreement.

Subject to the terms and conditions set forth in the Agreement, the Lender has agreed to make a loan to the Borrower in the amount of $46,850,000.00 (the "Loan") to finance the real estate project of the Borrower known as Anastasia Shores, St. Augustine Beach, Florida and The Bluff House, Orange Park, Florida (the "Project"). The Loan will be secured by a Mortgage executed by the Borrower with respect to the Project. As a condition of the obligation of the Lender to make the Loan, the Guarantor is required to execute and deliver to the Lender this Guaranty.

To induce the Lender to make the Loan and for other valuable consideration, the Guarantor agrees as follows:

1.    Guaranteed Obligations.  The Guarantor absolutely and unconditionally guarantees the punctual and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the following (the "Guaranteed Obligations"):  (a) all present and future indebtedness evidenced by the Note dated the date of this Guaranty in the face principal amount of $46,850,000.00 executed by the Borrower to the order of the Lender, including principal, interest and all other amounts payable under the terms of the Note; and (b) all other present and future obligations of the Borrower to the Lender under the Loan Documents (including any Environmental Indemnity executed by the Borrower in favor of the Lender and obligations in respect of Letters of Credit and Set Aside letters); in each case as such indebtedness and other obligations may from time to time be supplemented, modified, amended, renewed and extended, whether evidenced by new or additional Documents or resulting in a change in the interest rate on any indebtedness or otherwise. Upon the occurrence of any Event of Default, all Guaranteed Obligations shall, at the option of the Lender, immediately become due and payable by the Guarantor without protest, presentment, notice of dishonor, demand or further notice of any kind, all of which are expressly waived by the Guarantor, and irrespective of whether any Guaranteed Obligations have then become

LP 784348.4 \ 31849-60516

due and payable by the Borrower or any other Loan Party (each of the Borrower and any other Loan Party other than the Guarantor being referred to in this Guaranty as an "other Loan Party").

2.     Nature of Guaranty.     This Guaranty is a guaranty of payment and performance and not of collection and applies to all Guaranteed Obligations, whether existing now or in the future, including (a) interest and other Guaranteed Obligations arising or accruing after bankruptcy of any Loan Party or any sale or other disposition of any security for this Guaranty or for the obligations of any other Loan Party (any such security being referred to in this Guaranty as the "Security"), and (b) any Guaranteed Obligations that survive repayment of the Loan.  This Guaranty is in addition to the Completion Guaranty and Environmental Guaranty, each given by Guarantor to Lender as of the date hereof, as may be confirmed, reaffirmed and/or amended from time to time.  This Guaranty and any Security for this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment or performance of any Guaranteed Obligations is rescinded or must otherwise be returned by the Lender or any other Person upon the bankruptcy, insolvency or reorganization of any Loan Party or otherwise, all as though such payment or performance had not occurred.  The Guarantor shall have no authority, and hereby waives any right, to revoke this Guaranty, but if any purported revocation shall be deemed to have occurred by operation of law or otherwise, the provisions of this Guaranty shall continue to apply notwithstanding such revocation.

3.     Obligations Independent.   The obligations of the Guarantor under this Guaranty are independent of the obligations of any other Loan Party under the Loan Documents (such obligations of any other Loan Party, including the Borrower's obligations in respect of the Guaranteed Obligations, being referred to in this Guaranty as the "Other Obligations") and any Security, and the enforceability of any Security for this Guaranty is likewise independent of any such Other Obligations and any other Security.  The Lender may bring action against the Guarantor and otherwise enforce this Guaranty or any Security for this Guaranty without bringing action against any other Loan Party or joining any other Loan Party in any action against the Guarantor, and otherwise independently of any other Remedy that may be available to the Lender at any time with respect to any Other Obligations or Security.  The Guarantor waives any right to require the Lender at any time to proceed against any other Loan Party, apply any Security or otherwise enforce, proceed against or exhaust any Other Obligations or Security or pursue any other Remedy in the Lender's power.

4.     Action with Respect to Other Obligations or Security.   The Guarantor authorizes the Lender, without notice or demand and without affecting its liability under or the enforceability of this Guaranty or any Security for this Guaranty, from time to time to:     (a) supplement, modify, amend, renew, extend, accept partial payments or performance on or otherwise change the time, manner or place of payment or performance or the interest rate or other terms or the amount of, or release, reconvey, terminate, waive, abandon, subordinate, exchange, substitute, transfer or consent to the transfer of or enter into or give any other agreement, approval, waiver or consent with respect to or in exchange for any Other Obligations or Security or any of the Loan Documents; (b) receive and hold additional Security or guaranties; (c) release any other Loan Party from any personal liability with respect to any Other Obligations and participate in any bankruptcy or reorganization of any other Loan Party in such manner as the Lender may determine; and (d) accelerate, settle, compromise, compound, sue for, collect or otherwise liquidate, enforce or deal with any Other Obligations or Security

(including judicial or nonjudicial sale or other disposition of any Security) bid and purchase at any sale or other disposition of any Security and apply any Security and any proceeds or other payments received by the Lender, in each case in such order and manner as the Lender may determine.

5. **Waiver of Defenses**. The Guarantor waives any defense to the enforcement of this Guaranty or any Security for this Guaranty arising by reason of: (a) any present or future Laws or orders affecting the terms of, or the Lender's Remedies with respect to, any Other Obligations or Security; (b) the absence or cessation of personal liability of any other Loan Party with respect to any Other Obligations; (c) the failure of any other Person to execute this Guaranty or any other guaranty or agreement; (d) the failure of any Loan Party to properly execute any Loan Document or otherwise comply with applicable legal formalities; (e) the unenforceability or invalidity of any Other Obligations or Security or the lack of perfection or failure of priority of any other loss or impairment of any Security; (f) any discharge or release of any other Loan Party or any Other Obligations or Security or any impairment or suspension of any Remedies of the Lender, whether resulting from any act or omission of the Lender or any other Person or by operation of law or otherwise; (g) any bankruptcy, insolvency or reorganization of any Loan Party or any disability or other defense of any other Loan Party with respect to any Other Obligations or Security; (h) any failure of the Lender to disclose to the Guarantor any information relating to the financial condition, operations, properties or prospects of any other Loan Party now or in the future known to the Lender (the Guarantor waiving any duty on the part of the Lender to disclose such information); (i) any failure of the Lender to monitor proper application of loan funds or compliance with the Loan Documents, or to preserve, insure or protect any Security or any subrogation, contribution or reimbursement rights of the Guarantor; (j) any application of proceeds or payments received by the Lender to obligations other than the Guaranteed Obligations; (k) any other action by the Lender, whether authorized by § 4 or otherwise, or any omission by the Lender or other failure of the Lender to pursue, or any delay in pursuing, any other Remedy in the Lender's power; or (l) any defense arising from a claim that the obligations of the Guarantor are greater than those of the Borrower or any other Loan Party. Guarantor waives all rights and defenses arising out of any election of remedies by the Lender, even though that election of remedies, with respect to security for a guaranteed obligation, has destroyed the Guarantor's rights of subrogation and reimbursement against the principal by the operation of principles of subrogation, contribution, indemnification or otherwise.

The Guarantor waives all rights and defenses that the Guarantor may have because the Borrower's debt is secured by real property. This means, among other things:

1. The Lender may collect from the Guarantor without first foreclosing on any real or personal property collateral pledged by the Borrower.

2. If the Lender forecloses on any real property collateral pledged by the Borrower:

    (A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(B)     The Lender may collect from the Guarantor even if the Lender, by foreclosing on the real property collateral, has destroyed any right the Guarantor may have to collect from the Borrower.

This is an unconditional and irrevocable waiver of any rights and defenses the Guarantor may have because the Borrower's debt is secured by real property.

The Guarantor further waives: (i) any defense to the recovery by the Lender against the Guarantor of any deficiency or otherwise to the enforcement of this Guaranty or any Security for this Guaranty after a disposition of any Security for any Other Obligations that is determined, for any reason, to not have been conducted in a commercially reasonable manner, even though, in the case of any such Security subject to the Uniform Commercial Code, such failure may prevent the Guarantor from exercising Reimbursement Rights against any other Loan Party; (ii) any rights, defenses or benefits that are or may be available to the Guarantor by reason of suretyship principles, or comparable provisions of the Laws of any other jurisdiction and all other suretyship defenses it would otherwise have under the Laws of Florida or any other jurisdiction; (iii) all benefits of any statute of limitations affecting the Guarantor's liability under or the enforcement of this Guaranty or any Other Obligations or Security; (iv) all setoffs and counterclaims; (v) promptness, diligence, presentment, demand for performance and protest; (vi) notice of nonperformance, default, acceleration, protest or dishonor; (vii) except for any notice otherwise required by applicable Laws that may not be effectively waived by the Guarantor, notice of sale or other disposition of any Security; and (viii) notice of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Guaranteed Obligations, and all other notices of any kind with respect to any Other Obligations.

6.     **Waiver of Reimbursement Rights.**  Until all Other Obligations have been paid and performed in full, the Guarantor shall not exercise any rights of subrogation, reimbursement, contribution or indemnification or any similar rights or remedies (collectively, "Reimbursement Rights") against any other Loan Party, and waives any right to enforce any Remedy which the Lender now has or may in the future have against any other Loan Party and any benefit of, and any right to participate in, any Security or Other Obligations now or in the future held by the Lender. If the Guarantor nevertheless receives payment of any amount on account of any such Reimbursement Rights or otherwise in respect of any payment or performance by the Guarantor of any Guaranteed Obligations prior to payment and performance in full of all Other Obligations, such amount shall be held in trust for the benefit of the Lender and immediately paid to the Lender for application to the Other Obligations in such order and manner as the Lender may determine.

7.     **Representations of the Guarantor.**  The Guarantor represents and warrants to the Lender that: (a) this Guaranty is executed at the request of the Borrower; (b) the Guarantor has established adequate means of obtaining from any other Loan Parties on a continuing basis information pertaining to, and is now and on a continuing basis will be completely familiar with, the financial condition, operations, properties and prospects of such other Loan Parties; (c) the Guarantor has received and approved copies of all of the other Loan Documents; and (d) no oral promises, assurances, representations or warranties have been made by or on behalf of the Lender to induce the Guarantor to execute and deliver this Guaranty.

8. <u>Financial Statements and Tax Returns</u>. The Guarantor hereby agrees to deliver to the Lender, the following: (a) within one hundred twenty (120) days after the end of each fiscal year of the Guarantor for so long as any portion of the Loan is outstanding, Financial Statements for the Guarantor, in form and detail satisfactory to the Lender, for and as at the end of such fiscal year, (b) within forty-five (45) days after the end of each fiscal quarter of the Guarantor for so long as any portion of the Loan is outstanding quarterly Financial Statements in form and detail satisfactory to Lender, for and as at the end of such fiscal quarter, (c) within thirty (30) days of the date when due, Tax Returns for the Guarantor, and (d) upon request by the Lender from time to time, copies of audited Financial Statements prepared by the Guarantor, in each case certified in a manner acceptable to the Lender. All Financial Statements for Guarantor shall include, without limitation, a calculation of Guarantor's Tangible Net Worth and Liquidity as defined in Exhibit D, Section G.2 of the Agreement.

9. <u>Indemnification by the Guarantor</u>. Without limitation on any other obligations of the Guarantor or Remedies of the Lender under this Guaranty, the Guarantor shall indemnify, defend and save and hold harmless the Lender from and against, and shall pay on demand any and all losses, liabilities, damages, costs, expenses and charges (including the reasonable fees and disbursements of the Lender's legal counsel and the reasonable charges of the Lender's internal legal counsel) suffered or incurred by the Lender as a result of (a) any failure of any Guaranteed Obligations to be the legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency or other similar Laws affecting the rights of creditors generally, or (b) any failure of the Borrower to pay and perform any Guaranteed Obligations in accordance with the terms of such Guaranteed Obligations.

10. <u>Rights of Setoff</u>. Upon the occurrence and during the continuance of any Event of Default, the Lender is authorized at any time and from time to time to the fullest extent permitted by applicable Laws, and without notice or demand, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by the Lender to or for the credit or account of the Guarantor against any and all obligations of the Guarantor under this Guaranty.

11. <u>Waivers and Amendments</u>. No supplement to, modification or amendment of, or waiver, consent or approval under, any provision of this Guaranty shall be effective unless in writing and signed by the Lender, and any waiver, consent or approval shall be effective only in the specific instance and for the specific purpose for which given.

12. <u>Remedies</u>. Each of the Remedies provided in this Guaranty is cumulative and not exclusive of, and shall not prejudice, any other Remedy provided in this Guaranty or by applicable Laws or under any other Loan Document. Each Remedy may be exercised from time to time as often as deemed necessary by the Lender, and in such order and manner as the Lender may determine. No failure or delay on the part of the Lender in exercising any Remedy shall operate as a waiver of such Remedy; nor shall any single or partial exercise of any Remedy preclude any other or further exercise of such Remedy or of any other Remedy.

13.   Costs and Expenses.  The Guarantor shall pay to the Lender on demand all costs, expenses and charges of the Lender in connection with the enforcement of, or the exercise of, any Remedy or any other action taken by the Lender under or in connection with, this Guaranty or any Guaranteed Obligations, including the reasonable fees and disbursements of the Lender's legal counsel and other out-of-pocket expenses, and the reasonable charges of the Lender's internal legal counsel.

14.   Notices.  All notices and other communications provided under this Guaranty shall be in writing and mailed or delivered to the Guarantor at the address set forth on the signature page of this Guaranty or at any other address in the State of Florida as may be designated by the Guarantor in a written notice sent to the Lender in accordance with § 7.03 of the Agreement.  Any notice or other communication will be effective (a) if given by mail, on the earlier of receipt or the third day after deposit in the United States mails with first-class postage prepaid, or (b) if given by personal delivery, when delivered.

15.   Binding Agreement.  This Guaranty shall be binding on and inure to the benefit of the Guarantor and the Lender and their respective successors and assigns, except that the Guarantor shall have no right to assign any interest under this Guaranty without the prior written consent of the Lender.  The Lender may, from time to time, assign its interest under this Guaranty in whole or in part without notice to or the consent of the Guarantor.

16.   Multiple Guarantors.  If more than one Person signs this Guaranty as Guarantor, (a) the term "Guarantor" shall mean each such Person, (b) the obligations of each Guarantor shall be joint, several and independent, and (c) this Guaranty shall be construed and enforced as though each Guarantor executed a separate guaranty on the terms set forth in this Guaranty.

17.   Governing Law.  This Guaranty shall be governed by, and construed and enforced in accordance with, the Laws of Florida.

18.   Time of Essence.  Time is of the essence of each and every provision of this Guaranty.

19.   Nature of Waivers.  THE GUARANTOR HEREBY ACKNOWLEDGES THAT (A) THE GUARANTOR HAS CONSULTED WITH LEGAL COUNSEL TO UNDERSTAND THE FULL IMPACT OF THE WAIVERS MADE BY THE GUARANTOR PURSUANT TO THIS GUARANTY, INCLUDING THOSE SET FORTH IN §§ 2, 3, 4, 5, 6 AND 20 HEREOF, (B) THE GUARANTOR UNDERSTANDS THE FULL IMPACT OF SUCH WAIVERS, AND (C) SUCH WAIVERS HAVE BEEN KNOWINGLY AND WILLINGLY MADE BY THE GUARANTOR.

20.   Waiver of Jury Trial.  EACH OF THE LENDER AND THE GUARANTOR WAIVE TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING (INCLUDING COUNTERCLAIMS), WHETHER AT LAW OR EQUITY, BROUGHT BY THE LENDER OR THE GUARANTOR AGAINST THE OTHER ON MATTERS ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS GUARANTY, THE OTHER LOAN DOCUMENTS, THE LOAN OR ANY TRANSACTION CONTEMPLATED BY, OR THE RELATIONSHIP BETWEEN THE LENDER AND THE GUARANTOR OR ANY

OTHER LOAN PARTY OR ANY ACTION OR INACTION BY ANY PARTY UNDER, ANY OF THE LOAN DOCUMENTS.

"GUARANTOR":

_____
Ganesan Visvabharathy, individually

Guarantor's Address:

101 Oak Ridge Pkwy, #306
Burr Ridge, IL 60527

PLAINTIFF'S
EXHIBIT
4



July 23, 2007

Bluff House, LLC
Anastasia Shores, LLC
101 Burr Ridge Parkway, Suite 306
Burr Ridge, IL 60527

VIA UPS OVERNIGHT DELIVERY

Attn: Dr. Ganesan Visvabharathy

| Re: | Lender: | IndyMac Bank, F.S.B. |
|---|---|---|
| | Borrower: | Bluff House, LLC, and Anastasia Shores, LLC, each an Illinois limited liability company |
| | Loan No.: | 52-8300001 |
| | Loan Balance: | $33,911,905.09 |
| | Guarantor: | Dr. Ganesan Visvabharathy |

Dear Dr. Visvabharathy:

Please be advised that Bluff House, LLC and Anastasia Shores, LLC, each an Illinois limited liability company (jointly and severally the "Borrower") are in default under the Note, the Mortgage, the Building Loan Agreement and the other documents which evidence and secure the above Loan (collectively the "Loan Documents") by reason of your failure to pay the sums due upon the maturity of the Loan as well as numerous Events of Default.

Because the Promissory Note has matured, Lender hereby demands the entire unpaid principal balance of the Note and all accrued and unpaid interest thereon be paid immediately. The following amounts are now due and payable under the Loan Documents:

| (i) | Principal | $32,911,905.09 |
|---|---|---|
| (ii) | Interest Due (From 4/1/07 to 7/24/07) | 1,714,550.34 |
| (iii) | Late Fees | 133,702.28 |
| (iv) | Inspection Fees | 1,500.00 |
| (v) | Legal Fees | 1,668.50 |
| (vi) | Appraisal Fee | 13,000.00 |
| (vii) | Endorsement Fees | 175.00 |
| (viii) | Reconveyance Fee | 90.00 |

www.indymacbank.com

{01172092;1}

Homebuilder Division
233 South Wacker Drive, Suite 4620, Chicago, IL 60606

Tel: 312.333.5435
Fax: 312.333.5427

Bluff House, LLC
Anastasia Shores, LLC
Attn: Dr. Ganesan Visvabharethy
July 23, 2007
Page 2

| | | | |
|---|---|---|---|
| (ix) | UCC-Filing Fee | | 40.00 |
| (x) | Demand Fee | | 25.00 |
| | Total | | $34,776,656.21 |

In addition, per diem interest in the amount of $16,913.06 (calculated at the "Alternate Rate" = base rate + 10% = 18.50%) shall accrue on the outstanding principal balance of the Loan from July 24, 2007, to the date the funds are received. Per diem is subject to change if the *Wall Street Journal* Prime Rate should change. Should you have any questions as to the correct payoff amount, please confirm that amount with us at our offices as 312-332-1461.

Please note that additional monies and/or documentation may be required if any set aside letters or letters of credit have been issued in connection with the subject loan. It is imperative that you contact this office prior to full payoff of this loan to confirm additional requirements, if any.

INDYMAC BANK, F.S.B.
888 E. Walnut Avenue
Pasadena, CA 91101
Account Name: HBD Payoff Account
Routing Number: 322270288
Account Number: 85-27122-200000
Reference: Code X25QPC1
Loan Number: 52-8300001
Borrowers' Names: Bluff House, LLC and Anastasia Shores, LLC

Upon payment in full, a full reconveyance will be forwarded to your office for recordation. Please note that IndyMac Bank, Homebuilder Division, will not be responsible for any processing and/or recording fees for this transaction.

Capitalized terms used in this letter, but not defined herein, shall have the respective meanings set forth in the Loan Documents.

To the maximum extent provided for under the Loan Documents and under the guarantee executed by the guarantor (the "Guarantor") listed above in favor of Lender, Lender will seek to hold Borrower and the Guarantor liable for payments of the amounts due and owing to the Lender including, without limitation, the amounts set forth above and attorneys' fees and costs.

Please be advised that the description of the Loan Documents contained in this letter shall not be deemed to limit, amend or modify the terms of or otherwise affect the Loan Documents or any other documents evidencing or securing the Loan. Additionally, any description herein of the specific rights or remedies of the Lender shall not be deemed to limit or exclude any other

{O1172092;1}

Bluff House, LLC
Anastasia Shores, LLC
Attn: Dr. Ganesan Visvabharathy
July 23, 2007
Page 3

rights or remedies to which Lender may be or become entitled to under the Loan or the Loan Documents at law, in equity, or otherwise.

This Notice is being sent to you as a courtesy only and shall in no way be deemed to obligate Lender to give you or anyone else any notice of any kind in connection with the Loan Documents or otherwise. Any and all non-waiver provisions in favor of Lender contained in the Loan Documents remain in full force and effect and shall not be deemed to have been waived, in whole or in part, by Lender as a result of the delivery of this letter.

If the Lender does not receive payment in full of the above sums in clear funds within five (5) business days from the date hereof, Lender may, at its option, proceed with any and all rights and remedies that Lender may have, both at law or in equity, against the Borrower, the Guarantor, and the security for the Loan pledged by the Borrower.

Please govern yourself accordingly.

Very truly yours,

IndyMac Bank, F.S.B.

By: _____
Name: Todd Camp
Title: First Vice President

{O1172092;1}

# EXHIBIT B

AO 440 (Rev. 05/00) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS

SUMMONS IN A CIVIL CASE

INDYMAC BANK, F.S.B,
a Federal Savings Bank,

          Plaintiff,

      V.

GANESAN VISVABHRATHY,
an individual,

          Defendant

CASE NUMBER:

**07 CV 6226
JUDGE GOTTSCHALL
MAGISTRATE JUDGE COLE**

      TO: (Name and address of Defendant)

Ganesan Visvabharathy
7529 Ridgewood Ln
Burr Ridge, IL 60527-8022

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Gary L. Blackman (ARDC #6187914)
James G. Martignon (ARDC #6277974)
Levenfeld Pearlstein, LLC
2 N. LaSalle St., Ste. 1300
Chicago, IL 60602

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

MICHAEL W. DOBBINS, CLERK

KRYSTEN COPPOLETTA

_____
(By) DEPUTY CLERK

NOV 0 2 2007

_____
DATE

ClientCaseID: STEVE JAMES
Law Firm ID: LEVENFEL



CaseReturnDate: 12/28/07

Affidavit of Special Process Server

## UNITED STATES DISTRICT COURT

Case Number 07CV6226

I, MICHAEL P. FEEHAN

FIRST DULY SWORN ON OATH STATES THAT I AM OVER 18 YEARS OF AGE AND NOT A PARTY TO THIS SUIT AND IS A REGISTERED EMPLOYEE OF ILLINOIS DEPARTMENT OF PROFESSIONAL REGULATION PRIVATE DETECTIVE AGENCY #117-001292 STERN PROCESS & INVESTIGATION LLC 205 W. RANDOLPH ST. #1210 CHICAGO IL 60606

## ABODE SERVICE

THAT I SERVED THE WITHIN    SUMMONS AND COMPLAINT

ON THE WITHIN NAMED DEFENDANT    GANESAN VISVABHRATHY

PERSON SERVED    SURIYA (WIFE)

I SERVED A MEMBER OF HOUSEHOLD 13 YEARS OF AGE OR OLDER AT THE DEFENDANTS USUAL PLACE OF ABODE AND INFORMED THAT PERSON OF THE CONTENTS THEREOF AND FURTHER MAILED A COPY OF THE SUMMONS OR PROCESS IN A SEALED ENVELOPE WITH POSTAGE PREPAID TO THE DEFENDANT, AT HIS USUAL PLACE OF ABODE WITHIN TWO BUSINESS DAYS OF THE SERVICE.

UNCOOPERATIVE

That the sex, race and approximate age of the person whom I left the    SUMMONS AND COMPLAINT

are as follow:    Sex  FEMALE  Race  ARABIC    Age  51

Height  5'3"    Build  MEDIUM    Hair  BROWN

LOCATION OF SERVICE    **7529  RIDGEWOOD LANE**
**BURR RIDGE, IL, 60527**

Date Of Service:  12/1/07    Time of Service:  9:15 AM    Date Of Mailing    12/2/2007

MICHAEL P. FEEHAN    12/3/2007

**Special Process Server**
P.E.R.C. #129-157466

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statement are true and correct, except as to matters therein stated to be on information and belief and such matters the undersigned certifies as aforesaid that he/she verily believes same to be true.

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| INDYMAC BANK, F.S.B<br>a Federal Savings Bank, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | 07 C 6226 |
| | ) | |
| vs. | ) | Honorable Judge Joan B. Gottschall |
| | ) | |
| GANESAN VISVABHARATHY, | ) | |
| an individual | ) | |
| | ) | |
| Defendant | ) | |

## ATTORNEY'S AFFIDAVIT OF DEFAULTED PARTIES

I, James G. Martignon, attorney for Plaintiff, Indymac Bank, F.S.B., hereby certify that the following specific facts are applicable to the above captioned proceeding and brought to the attention of the Court for the purpose of entering judgment hereunder:

1.     The following is the date the Court obtained jurisdiction over the Defendant by service of summons, publication or otherwise:

| Defendants | Jurisdiction Date | Method of Service |
|---|---|---|
| Ganesan Visvabharathy | December 1, 2007 | Abode |

2.     The proof of service of the foregoing Defendant is attached hereto as Exhibit "1" and made a part hereof.

3.     The only appearance and answer which were timely filed are as follows:

| Defendants | Date of Appearance | Date of Answer |
|---|---|---|
| Ganesan Visvabharathy | None | None |

4.     A copy of the court docket dated January 2, 2008 showing no appearance or answers filed by the Defendants is hereto as Exhibit "2".

I, James G. Martignon, attorney at law and counsel for the Plaintiff, hereby certify to the best of my knowledge, the above to be true and correct as of January 2, 2008.

                                 /s/ James G. Martignon
                                  James G. Martignon

# EXHIBIT 1

ClientCaseID: STEVE JAMES
Law Firm ID: LEVENFEL



* 1 6 9 6 8 7 A *

CaseReturnDate: 12/28/07

**Affidavit of Special Process Server**

# UNITED STATES DISTRICT COURT

Case Number **07CV6226**

I, MICHAEL P. FEEHAN

FIRST DULY SWORN ON OATH STATES THAT I AM OVER 18 YEARS OF AGE AND NOT A PARTY TO THIS SUIT AND IS A REGISTERED EMPLOYEE OF ILLINOIS DEPARTMENT OF PROFESSIONAL REGULATION PRIVATE DETECTIVE AGENCY #117-001292 STERN PROCESS & INVESTIGATION LLC 205 W. RANDOLPH ST. #1210 CHICAGO IL 60606

# ABODE SERVICE

THAT I SERVED THE WITHIN     SUMMONS AND COMPLAINT
ON THE WITHIN NAMED DEFENDANT     **GANESAN VISVABHRATHY**
PERSON SERVED     SURIYA (WIFE)
I SERVED A MEMBER OF HOUSEHOLD 13 YEARS OF AGE OR OLDER AT THE DEFENDANTS USUAL PLACE OF ABODE AND INFORMED THAT PERSON OF THE CONTENTS THEREOF AND FURTHER MAILED A COPY OF THE SUMMONS OR PROCESS IN A SEALED ENVELOPE WITH POSTAGE PREPAID TO THE DEFENDANT, AT HIS USUAL PLACE OF ABODE WITHIN TWO BUSINESS DAYS OF THE SERVICE.

UNCOOPERATIVE

That the sex, race and approximate age of the person whom I left the     **SUMMONS AND COMPLAINT**
are as follow:     **Sex** FEMALE **Race** ARABIC     **Age** 51
                   **Height** 5'3"     **Build** MEDIUM     **Hair** BROWN

LOCATION OF SERVICE     **7529 RIDGEWOOD LANE**
                        **BURR RIDGE, IL, 60527**

Date Of Service:     12/1/07     Time of Service:     9:15 AM     Date Of Mailing     12/2/2007

_(signature)_

MICHAEL P. FEEHAN     12/3/2007

**Special Process Server**
P.E.R.C. #129-157466

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statement are true and correct, except as to matters therein stated to be on information and belief and such matters the undersigned certifies as aforesaid that he/she verily believes same to be true.

_(signature)_

# EXHIBIT 2

COLE

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 3.0 (Chicago)
### CIVIL DOCKET FOR CASE #: 1:07-cv-06226

Indymac Bank, F.S.B. v. Visvabharathy
Assigned to: Honorable Joan B. Gottschall
Cause: 28:1331 Fed. Question: Breach of Contract

Date Filed: 11/02/2007
Jury Demand: None
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Indymac Bank, F.S.B.**
*a Federal Savings Bank*

represented by **Gary Irwin Blackman**
Levenfeld Pearlstein
2 North LaSalle Street
13th Floor
Chicago, IL 60602
(312)346-8380
Email: gblackman@lplegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James G Martignon**
Levenfeld Pearlstein, LLC
2 North LaSalle Street
Suite 1300
Chicago, IL 60602
(312)346-8380
Email: jmartignon@lplegal.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ganesan Visvabharathy**
*an individual*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/02/2007 | 1 | COMPLAINT filed by Indymac Bank, F.S.B.; Filing fee $ 350.(vmj, ) (Entered: 11/06/2007) |
| 11/02/2007 | 2 | CIVIL Cover Sheet (vmj, ) (Entered: 11/06/2007) |
| 11/02/2007 | 3 | ATTORNEY Appearance for Plaintiff Indymac Bank, F.S.B. by Gary Irwin Blackman (vmj, ) (Entered: 11/06/2007) |
| 11/02/2007 | 4 | ATTORNEY Appearance for Plaintiff Indymac Bank, F.S.B. by James G |

| | | Martignon (vmj, ) (Entered: 11/06/2007) |
|---|---|---|
| 11/02/2007 | 5 | RULE 7.1 and Local Rule 3.2 Disclosure Statement by Indymac Bank, F.S.B. (vmj, ) (Entered: 11/06/2007) |
| 11/02/2007 | 7 | 2 SUMMONS and 2 copies Issued as to Defendant Ganesan Visvabharathy (2 difference addresses) (vmj, ) (Entered: 11/06/2007) |
| 11/26/2007 | 8 | MINUTE entry before Judge Joan B. Gottschall :Status hearing set for 1/23/2008 at 09:30 AM. Plaintiff is directed to advise the defendants of the status hearing forthwith. Parties are directed to discuss settlement of case, consent to proceed before the Magistrate Judge and a proposed discovery plan. Mailed notice (rj, ) (Entered: 11/26/2007) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/02/2008 09:23:34 | | |
| **PACER Login:** | lp0214 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:07-cv-06226 |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 3.0
### Eastern Division

Indymac Bank, F.S.B.

Plaintiff,

v.

Ganesan Visvabharathy, et al.

Defendant.

Case No.: 1:07−cv−06224
Honorable Ronald A. Guzman

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, January 15, 2008:

    MINUTE entry before Judge Ronald A. Guzman :Motion hearing held on 1/15/2008 regarding motion by Plaintiff Indymac Bank, F.S.B. for default judgment as to Visvabharathy and Hawthorne Orlando Corp.[13]. Motion is denied without prejudice as to Defendant Hawthorne Orlando Corp. Defendant Visvabharathy's response to motion for default to be filed on or before 2/14/08. Status hearing set for 1/30/08 is reset to 2/22/2008 at 09:30 AM. Mailed notice(cjg, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov.*

# EXHIBIT D

## AFFIDAVIT OF SURIYA V. SASTRI

1. I am over the age of 21. I make this affidavit based on my personal knowledge.

2. I reside at 7529 Ridgeweood Lane, Burr Ridge, Illinois. My husband, Dr. Ganesan Visvabharathy, has not lived there since at least the summer of 2006. Prior to the summer of 2006, he did reside there with me, but permanently moved out as part of our separation. Divorce proceedings are pending.

3. It is my understanding that, when he moved out, Dr. Visvabharathy established his own separate abode.

4. In November 2007, a man came to my residence asking for Dr. Visvabharathy. I told him that Dr. Visvabharathy no longer lived there. He then said that he was a process server, there to serve legal papers on Dr. Visvabharathy, and threatened to have the police serve the papers at midnight. I responded that, no matter what time anyone came for Dr. Visvabharathy, they would not find him at my residence, because he did not live there anymore. The server also threatened to harass my children for information about Dr. Visvabharathy. The server left without attempting to give me any papers at that time.

5. On December 1, 2007, the process server returned to my residence, again asking for Dr. Visvabharathy. I again told him that Dr. Visvabharathy did not live there. The server responded that the judge had ordered that papers be served at my residence and, when I would not accept them, he left the papers at my front door.

6. I have not given Dr. Visvabharathy any of the papers left by the process server.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: February 13, 2008

_____
Suriya V. Sastri

# EXHIBIT E

## AFFIDAVIT OF GANESAN VISVABHARATHY

1.    I am over the age of 21. I make this affidavit based on my personal knowledge.

2.    I have not lived at 7529 Ridgewood Lane, Burr Ridge, Illinois since at least the summer of 2006. Prior to the summer of 2006, I did reside at that house with my wife, Dr. Suriya Sastri, but permanently moved out as part of our separation. Divorce proceedings are pending.

3.    When I left Dr. Sastri's residence, I established my own separate abode.

4.    I have been traveling abroad for the past several months, beginning in about October 2007.

5.    Dr. Sastri has not provided me with any complaint or other legal pleading related to any lawsuit by Indymac against me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: February 14, 2008

_____
Ganesan Visvabharathy

# EXHIBIT F

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 672830 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 1

**H**
Government Employees Ins. Co. v. Jackson
E.D.Pa.,1995.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
GOVERNMENT EMPLOYEES INSURANCE
COMPANY,
v.
Rashelle JACKSON and Leroy A. Jackson.
No. CIV.A. 89-4010.

Nov. 6, 1995.

MEMORANDUM ORDER

WALDMAN.

*1 Presently before the court is defendant Rashelle Jackson's Motion for Relief from Judgment Pursuant to Fed.R.Civ.P. 60(b)(4) on the grounds that the court lacked subject matter and personal jurisdiction to enter a default judgment against her on April 24, 1990.

Absent a "clear usurpation of power," a judgment sustaining subject matter jurisdiction has res judicata effect as to collateral challenges to such jurisdiction even if the jurisdictional issue was not actually presented in the earlier proceeding. *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 377-78 (1940); *Nemaizer v. Baker,* 793 F.2d 58, 64-65 (2d Cir.1986); *Lubben v. Selective Serv. Sys. Local Bd. No. 27,* 453 F.2d 645, 649 (1st Cir.1972); *Vecchione v. Wohlgemuth,* 426 F.Supp. 1297, 1307-09 (E.D.Pa.), *aff'd,*558 F.2d 150 (3d Cir.), *cert. denied,*434 U.S. 943 (1977). A default judgment constitutes an implicit ruling on subject matter jurisdiction and an erroneous determination does not make the judgment void under Rule 60(b)(4). *Malone v. General Elec. Credit Corp.,* 1992 WL 610515, at *4 (S.D.Miss. Sept. 8, 1992) (court implicitly determined subject matter jurisdiction by entering a default judgment which, though possibly erroneous, is not open to collateral attack); *Metropolitan Life Ins. Co. v. Cammon,* 1990 WL 44687, at *7 (N.D. Ill. April 6, 1990)(potentially

improper determination of diversity jurisdiction did not render default judgment void), *aff'd,*929 F.2d 1220 (7th Cir.1991); *Honneus v. Donovan,* 93 F.R.D. 433, 436-37 (D.Mass.)(that district court's implicit determination that it had subject matter jurisdiction when entering default judgment may have been erroneous does not render judgment void under Rule 60(b)(4)), *aff'd,*691 F.2d 1 (1st Cir.1982).

When diversity jurisdiction is sufficiently, even if improperly, alleged, the court has not "clearly usurped" its powers and a default judgment is not void. *Honneus v. Donovan,* 691 F.2d 1, 2 (1st Cir.1982); *Malone,* 1992 WL 610515, at *4. See also *Cripps v. Life Ins. Co. of North America,* 980 F.2d 1261, 1267 (9th Cir.1992); *Duncan v. Lord,* 409 F.Supp. 687, 692 (E.D.Pa.1976) (same). Plaintiff in this case plainly alleged diversity of citizenship and a requisite amount in controversy.

Movant's assertions regarding personal jurisdiction are another matter. A defaulting defendant does not waive any objections based on lack of personal jurisdiction, *Baldwin v. Iowa State Traveling Men's Ass'n,* 283 U.S. 522, 525 (1931), and there is no time limit for making such an objection after a default. *Orner v. Shalala,* 30 F.3d 1307, 1310 (10th Cir.1994); *Hertz Corp. v. Alamo Rent-A-Car, Inc.,* 16 F.3d 1126, 1130 (11th Cir.1994); *Austin v. Smith,* 312 F.2d 337, 343 (D.C.Cir.1962).

Movant claims that she was never served with the summons or a copy of the complaint in this case pursuant to Fed.R.Civ.P. 4. It is elemental that effective service of process is a jurisdictional prerequisite and if a defendant is not properly made a party to the action by effective service, she is not bound by any judgment rendered. *Lampe v. Xouth, Inc.,* 952 F.2d 697, 701 (3d Cir.1991). If movant was not effectively served, the default judgment entered against her is, *a fortiori,* void and should be set aside without regard to factors such as possible prejudice to the plaintiff, the existence of a meritorious defense or defendant's culpable conduct. *Combs v. Nick Garin Trucking,* 825 F.2d 437,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 672830 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

441-2 (D.C.Cir.1987); *Gold Kist, Inc. v. Laurinburg Oil Co., Inc.,* 756 F.2d 14, 19 (3d Cir.1985). If the judgment is void, relief is mandatory. *Chambers v. Armontrout,* 16 F.3d 257, 260 (8th Cir.1994); *Combs,* 825 F.2d at 441; *Honneus v. Donovan,* 691 F.2d 1, 2 (1st Cir.1982).

**\*2** It is unclear from the record whether plaintiff mailed the summons and complaint pursuant to Fed.R.Civ.P. 4(c)(2)(C)(ii), or hand delivered them pursuant to Fed.R.Civ.P. 4(c)(2)(C)(i) or 4(d)(1) FN1 (the service rules in effect in 1989). The following pertinent facts, however, are uncontested. Plaintiff attempted to serve defendants Rashelle and Leroy Jackson on July 25, 1989 at 130 East Main Street, Norristown, Pennsylvania. Petitioner was not personally served. Her husband, Leroy Jackson, signed her acknowledgment form.

> FN1. Movant states that plaintiff mailed the summons and complaint. This contention is supported by plaintiff's use of an acknowledgment form which states that "the enclosed summons and complaint are served pursuant to Rule 4(c)(2)(C)(ii)." Other evidence, however, suggests that plaintiff hand-delivered the summons and complaint. The declaration of mailing was left blank on the acknowledgment form, a motion for special appointment to serve process was filed and signed and plaintiff filed an affidavit of service with the court, which was unnecessary if service was mailed pursuant to Fed.R.Civ.P. 4(c)(2)(C)(ii).

Movant avers that at the time of service she was separated from her husband and resided at 5450 Wissahickon Avenue in Philadelphia, and that the Norristown address was her husband's office and not her place of business. Plaintiff concedes that it cannot refute movant's version because it has destroyed all relevant records in the intervening five years, and has not requested discovery on the issue. Because there is no competent evidence to show that movant lived or conducted business at the Norristown address, it appears that service un-

der either Fed.R.Civ.P. 4(d)(1)(allowing for service at defendant's "dwelling house or usual place of abode") or Pa. R. Civ. P. 402 (allowing for service at defendant's "residence" or "usual place of business") was ineffective.

If plaintiff mailed the summons and complaint pursuant to Fed.R.Civ.P. 4(c)(2)(C)(ii), service was effective only if defendant signed and returned the acknowledgement form. *Stranahan Gear Co. v. NL Indus., Inc.,* 800 F.2d 53, 56 (3d Cir.1986). Because the requirements of this rule are strictly construed, *see Green v. Humphrey Elevator and Truck Co.,* 816 F.2d 877 (3d Cir.1987); *Stranahan Gear,* 800 F.2d at 56-7, and defendant did not sign and return the requisite acknowledgment form, service would likewise be ineffective under Fed.R.Civ.P. 4(c)(2)(C)(ii). *See Mason v. Genisco Technology Corp.,* 960 F.2d 849 (9th Cir.1992) (service ineffective under Rule 4(c)(2)(C)(ii) where defendant did not sign and return acknowledgment form although his wife signed return receipt).

Plaintiff's contention that movant's estranged husband was authorized to accept service on her behalf is unsupported and unavailing. It is true that a plaintiff may properly serve anyone who is the defendant's "agent authorized by appointment or by law to receive service of process." Fed.R.Civ.P. 4(d)(1). There must, however, be proof of an actual appointment for the specific purpose of receiving service of process. *Gerritsen v. Escobar Y Cordova,* 721 F.Supp. 253, 256 (C.D.Cal.1988); *Whisman v. Robbins,* 712 F.Supp. 632, 636 (S.D.Ohio 1988); *Gipson v. Township of Bass River,* 82 F.R.D. 122, 125 (D.N.J.1979). *See also* 4A Charles A Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1097 (2d ed.1987). A mere representation by the recipient that he is authorized to accept service is insufficient to bind a defendant. It must appear that the defendant intended to confer such authority on the recipient. *First American Bank v. United Equity Corp.,* 89 F.R.D. 81, 84 (D.D.C.1981); Wright & Miller, *supra,* at § 1097.

**\*3** ACCORDINGLY, this day of November, 1995, upon consideration of defendant Rashelle

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 672830 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Jackson's Motion for Relief from Judgment Pursu-
ant to Fed.R.Civ.P. 60(b)(4) and plaintiff's response
thereto, IT IS HEREBY ORDERED that said Mo-
tion is GRANTED and the default judgment entered
in the above action on April 24, 1990 against
Rashelle Jackson is VACATED.

E.D.Pa.,1995.
Government Employees Ins. Co. v. Jackson
Not Reported in F.Supp., 1995 WL 672830 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Daniel Shmikler, an attorney, hereby certify that on February 14, 2008, I electronically filed **Defendant's Memorandum In Support of Motion to Vacate Order Of Default And Quash Service** with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following persons listed below:

> Gary I. Blackman, Esq.
> James G. Martignon, Esq.
> Levenfeld Pearlstein, P.C.
> 2 North LaSalle Street
> Suite 1300
> Chicago, Illinois 60602

> /s/ Daniel A. Shmikler
> Daniel A. Shmikler